UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA


UNITED STATES OF AMERICA,          ) CASE NO: 2:17-CR-00520-DSF
                                   )
            Plaintiff,             )        CRIMINAL
                                   )
     vs.                           )  Los Angeles, California
                                   )
BERNHARD EUGEN FRITSCH,            )  Friday, August 11, 2017
                                   )
            Defendant.             )  (2:03 p.m. to 2:51 p.m.)


DETENTION HEARING

BEFORE THE HONORABLE ROZELLA A. OLIVER,
UNITED STATES MAGISTRATE JUDGE



APPEARANCES:

For Plaintiff:          CASSIE PALMER, ESQ.
                        Assistant United States Attorney
                        312 North Spring Street
                        Los Angeles, CA 90012

For Defendant:          MARK J. WERKSMAN, ESQ.
                        Werksman Jackson Hathaway & Quinn
                        888 W. Sixth St., 4th Floor
                        Los Angeles, CA 90017

Court Reporter:         Recorded; CourtSmart

Courtroom Deputy:       Gay Roberson

Transcribed by:         Exceptional Reporting Services, Inc.
                        P.O. Box 18668
                        Corpus Christi, TX 78480-8668
                        361 949-2988


Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

2

**Los Angeles, California; Friday, August 11, 2017; 2:03 p.m.**

**(Call to order)**

THE COURT:  Calling Case Number 17-mj-1913, *United States of America versus Bernhard Eugen Fritsch*.  Counsel, please state your appearances for the record.

MS. PALMER:  Good afternoon, your Honor, Cassie Palmer for the United States, and standing in today for Ms. Escalante who is out of the office.  And with me at counsel table is FBI Special Agent Gregory Austin.

THE COURT:  Good afternoon.

MR. WERKSMAN:  Good afternoon, your Honor, Mark Werksman appearing on behalf of Mr. Fritsch who's present in custody.

THE COURT:  Good afternoon, please be seated.  All right, Mr. Werksman, we are here on your application for the Court to reconsider its order of detention in this matter. Have you had an opportunity to review the Pretrial Services report and its recommendation, Mr. Werksman?

MR. WERKSMAN:  Yes, I have.

THE COURT:  All right, I'll hear from -- and have you also had an opportunity to review the Government's reply or response to your request for reconsideration?

MR. WERKSMAN:  Yes, your Honor.

THE COURT:  Okay, all right.  Mr. Fritsch can remain at the -- where you're seated, sir.  But, Mr. Werksman, if you

3

would come up?

MR. WERKSMAN:  Thank you.

THE COURT:  I do -- I would like to hear from you, and I have some questions that I'd like to hear your thoughts on.

MR. WERKSMAN:  Thank you.  First of all, your Honor, I want to thank you for putting us on calendar and giving us a chance to address the issue of bond.  The last time Mr. Fritsch was in Court, he'd been arrested without notice that he was under investigation, cut off from friends, family, business associates, even from counsel, and he appeared with a public defender really incapable of putting forward any meaningful defense against the accusations and to try to convince the Court to release him on a reasonable bond.  Also, before I go any further, I want to let the Court know that the entire left side of the courtroom is populated by close friends and family and loved ones of Mr. Fritsch who are here today to show their support for him.  One of the gentlemen here in the second row is offering to do an affidavit of surety for $10,000.  That's Casper von Winterfeldt.

And, your Honor, this is an unusual and a troubling case because you have a 56-year-old permanent resident of the United States with no prior criminal record of any kind who also happens to be a German national.  But he's lived here and done business here for 21 years, the last seven years or so

4

he's been a green card holder, a permanent resident.  And by the way, your Honor, I do have today here with me his German passport, unexpired German passport just so there's no possibility that he'd have any other official travel documents. I have his green card and I have a Connecticut driver's license which he obtained when he lived for many years in Connecticut. Connecticut is where his wife of 13 years, Lisa Short, lives with -- his ex-wife of 13 years lives with his two young children, Max and Harry.  They're ages 13 and ten respectively. They are U.S. citizens, as is Ms. Short.

And by the way, your Honor, there's a suggestion in the Pretrial report that the Government was not able to locate divorce documents.  There's some insinuation that he's not really divorced from Ms. Short.  But I've spoken to FBI Special Agent Austin and he can address this, but I think he represented to me that at least from the point of view of the FBI, they're aware there's been a divorce, although there don't appear to be any documents that they were able to obtain on short notice regarding that.  I don't think it's really in question that he's divorced from her.  I think having spoken to her many times, I think she knows and expects to be quite divorced from him.

Your Honor, this is a man who is an acknowledged expert in the field of online digital marketing, who is somewhat renowned in the technology community as having been

5

the man who developed the software about 25 years ago that became iTunes.  And it earned him acclaim, a reputation, a small fortune back in the 1990s that allowed him to embark on a career in digital online media services.  This business that he's involved with called StarClub has been underway for several years, and it's doing things that are considered innovative and somewhat revolutionary.  And if he were given an opportunity, he would see through the plan to develop the products that this company has been working on for years.

What we have here, though, is a situation where the FBI and the United States Attorney's Office arrested him abruptly last Wednesday based upon a complaint supported by an affidavit which describes approximately year-long FBI investigation that centered on the accusations by four disgruntled investors who did not feel that they were getting -- being treated fairly, they did not feel they'd been treated honestly, they did not feel that they were being rewarded properly.  My impression is that these four investors are all related somehow in the sense that there's one initial DG -- I won't mention his name in court because apparently the Government wants to keep as initials, that's fine.  There's a DG and then the others appear to have been referred by DG.  So there may be an effort by a block of shareholders to gain control of the company.  And they're using a Federal criminal arrest and prosecution in order to effectuate this aim.

6

Now, your Honor, I'm new to this.  I've only been on the case for about a week.  There's a lot of evidence that has to be reviewed.  My client assiduously, unequivocally denies the allegation that he misrepresented his business to investors or that he squandered corporate assets.  In order for him to effectively mount a defense to these serious and complicated charges, he needs to be released on bond.  I can tell your Honor after 30 years of practicing in these courts and handling financial crimes cases, a defendant is put at a fatal disadvantage rising almost to the level of a Sixth Amendment issue where he's deprived of effective assistance of counsel and incapable of properly defending himself when he's yanked out of his life, separated from his documents, his witnesses, his defenses, his world and he has to sit at the Metropolitan Detention Center and wait for me to visit him.  And between being thrown out because of a count or being shut away because of a lockdown, we have to go through the evidence.  It's very, very difficult.

So here we are with a man who, if he were not a German national, I think it would be very easy for this Court to impose a reasonable bond.  It's not a presumption case, and he's otherwise entitled to a reasonable bond.  Now, let me say this about his being a German national, your Honor.  He did not become a German national in order to evade arrest or to become a fugitive and avoid extradition in this case.  He was born in

Germany.  That's now being held against him.  Honestly, your Honor, I don't think he had any idea that being a German meant that if he ever got arrested, that if he got back to Germany somehow, he might somehow be free from extradition.  It didn't occur to him, much as it didn't occur to him that he would become a fugitive when he embarked upon a plan to lease an airplane.  The Government cites that as another example of how he might be a fugitive, he might run, he might leave, he might abscond.  But these things, like buying an airplane when you're an international businessman who does travel internationally -- and he does business around the world, and he does have assets that are in different places, and he's planning to lease an airplane before he even knows he's under investigation.  How can that be used against him as evidence that he might be a flight risk or that he may be seeking to abscond?  He had no idea over the past few months when he was negotiating the lease of an airplane that he would get arrested on August 2nd and be here.  So by the way, your Honor, he doesn't have the airplane.  I'm told that the negotiations over the purchase of the plane fell through and that the other -- the Government submitted a copy of the contract.  In addition of 130 pages of the German constitution, we got all the air leasing documents, and in there there's another guy named Sean Horowitz.  I'm told that he owns the plane.  But I think it would be a shame if this Court concluded that because he was

seeking to lease a plane, because he happens to be German, because he has a Bahamian driver's license and had residence in Bahamia (phonetic) because he had a house there years ago, that he's somehow a flight risk, when he has no intent to flee.  And when he acquired a house in the Bahamas and a driver's license there, and when he sought to lease a plane, he had no idea that he would be arrested.

And by the way, your Honor, this is also one of those cases where he was never given an opportunity to explain or rebut or argue through counsel or even individually why he doesn't deserve to be arrested and prosecuted.  I'm not accusing the FBI or the Government of bad faith here.  They do what they do and they do what they think they need to do.  And I've had nothing but very professional dealings with Mr. Austin and with this nice Assistant U.S. Attorney.  However, let's be honest here.  We've got a guy with no prior criminal record involved in a complicated business that does things that most people don't even understand what they do, because you really have to know coding and software and digital media to understand what they do.  And based upon an accusation by some investors that they feel like they were hoodwinked and then the Government sent a meeting -- had a meeting with an undercover and he also had a conversation with Mr. Fritsch and they decide, we're going to hook this guy up, we're going to arrest him, and we're going to prosecute him.  But they never gave him

9

a chance to explain himself.  This may be more appropriately tried in a civil court as a breach of contract lawsuit by DG and his affiliates who may want to sue Mr. Fritsch if they believe there's been some breach of contract.  But bringing in the United States government and imposing the enormous power of the U.S. government in the form of a sudden criminal complaint and an arrest without notice is devastating, not only for Mr. Fritsch, of course, but for his business.

Now, in light of the fact that he's been detained now for a week, he was asked by the company's counsel to resign, and he did submit a resignation.  So the Government's concern that if he were released, he might be in a position to influence the company's assets or the business in such a way that it could disadvantage investors or enrich himself, that's not a concern.  I have here the papers that he signed that were submitted to company counsel about three days ago in which he resigned, and so the company is now securely being managed by somebody unaffiliated by Mr. Fritsch's criminal accusations. So he would not have any direct access to or control over the company.

But he's the spirit of the company, he's the face of the company.  As long as Bernard Fritsch sits in custody, it's going to be very difficult for this company to move forward. He's the brains behind the company.  So while the company is now legally controlled by responsible counsel -- and I don't

10

know who's going to be taking over in the coming days, this is all an evolving situation -- if he can't meaningfully participate in the development of the software behind this product, if he can't participate in executing the vision that this entire company was founded upon, it'll collapse and the investors will certainly lose everything.  And a lot of innocent people will be harmed as well:  employees, suppliers, creditors, everything is at risk.

And so I'm asking your Honor to set a reasonable bond.  And I've offered more than just a plea.  I've offered the support of friends and associates.  I've offered his passport.  He could be on an ankle bracelet.  This is a perfect candidate for electronic monitoring.  He has a home, it's 3229 Rambla Pacifico property.  He can live there, he worked there.  At one time there were 17 employees there.  This is -- this home -- by the way, this will all come out.  I know your Honor doesn't want to litigate the underlying facts of the wire fraud allegation, but this will all come out, that the home is part of the business.  There was an office as well in Santa Monica, but he could be living in the Santa Monica -- in the Malibu home tethered to an ankle bracelet with electronic monitoring, surrendering his passport, he could surrender his green card, surrender his driver's license which we're prepared to do instantly.  He has a brother named Clemens (phonetic) who is an eye doctor in Dusseldorf, Germany and the man wire transferred

$50,000 to my trust.  I have a check here from my trust that I would post as a cash bond.  I have a $100,000 affidavit of surety from this ex-wife, Lisa Short, who is the mother of his two U.S. citizen children, and she herself is a U.S. citizen.

And by the way, I should add there is a third child. He's a 20-year-old son from a previous relationship.  He is not a U.S. citizen but he's also a permanent resident.  His name is David, and he was in New York when this hearing was scheduled. He can't be here today, but he does have a third son here in the United States.

We have a $100,000 affidavit of surety from his cousin Mark Montgomery who's a dentist in Maryland, suburban Baltimore.  And then we have a $10,000 affidavit of surety from Casper von Winterfeldt who's here in Court today, and he's a prominent local businessman and a long-term friend and associate of Mr. Fritsch's.

Your Honor, this is a man who ought to be released on bond.  He ought to have an opportunity to prepare a defense at liberty.  He's lived and worked here for 21 years.  I know the Government, I think what they did is they proceeded along the lines that he would be -- I think they assumed he'd flee.  They never gave him a chance.  They never gave him a phone call and said, this is the FBI, we're investigating you, can you and your lawyer come down here and talk about these allegations.  I think what happened is the Government basically concluded that

12

he's a flight risk, and so they set up this case so that they could snatch him off the street literally one day and put him here.  And then the double whammy is then they say, oh, look, you're in jail.  If we let you out, now we know you're going to flee.  Look at you, you've been arrested, why wouldn't you flee?  When if he'd been told three months ago, hey, we're thinking about indicting you, get in here and explain this, he would have stood his ground.  And he will stand his ground. He's retained responsible counsel, myself.  And he's doing everything he can now to try to crawl his way out of the deep hole that the Government flung him in when they arrested him without notice last week.  But it's a slippery slope to a very, very dark place when you get arrested like this and you're cut off from everything; and then nobody wants to touch you and they assume you're going to flee; and by the way, you're German and we know that means that means that any German is going to go back to Germany.  But why would he?  His family is here, his life is here, his work is here.  You know, your Honor, the migration of people in the tech world, it only goes in one direction.  It goes from east to west.  People don't immigrate to Germany from the United States.  People don't flee the United States to Germany.  They leave Germany to come here. This is where it's happening, this is where his business is, this is where his associates are, this is where he's made a living for 21 years.  This is not a man who's going to run.

13

Now, it would be a different story if he'd been told three months ago we're thinking of indicting you and then he sought to lease a plane and then he went and got a Bohemian (phonetic) address and then he went and bought property elsewhere and then he did this and he did that and the other thing.  But this man had no idea that he was going to be arrested.  So I would ask you to kind of push away some of the inherent prejudice that attaches when a man gets snatched up like this and he's basically isolated and detained, and then he's sort of begging a judge to kind of roll the clock back a week and treat him like the distinguished, successful, educated businessman that he is with no prior criminal record, and a lot of people who care about him and are vested deeply in him.  And if your Honor would view him in that light, I think this bail package would make sense.  And I would ask you to release him forthwith upon my posting the cash bond.  We have the affidavits of surety.  I know the U.S. Attorney has to review them and she may have something to say about them.  But we can definitely post a cash bond immediately, surrender his passport, he can be hooked up to an ankle bracelet today, and then we can deal with all this.

THE COURT:  Mr. Werksman, I have a few questions.  So as I must, in deciding whether or not the Government has shown by a preponderance of the evidence that Mr. Fritsch is a risk of nonappearance, I look at the factors set forth in 3142(g).  And in particular, looking at the history and characteristics

here, I have concerns about the following.  Of course it's not the fact that Mr. Fritsch is a German citizen.  It's not that there's any -- the Court is trying to attach any prejudice or stigma to that fact.  The Court evaluates what his ties are to this district and ties to other jurisdictions, in this case international.  And when I look at his ties to this district, I do see that he has been here for several years.  But I also see -- I guess at that current address since 2010.  But I also see as one of the Government's exhibits that he appears to also hold out a residence in the Bahamas.  I see the fact of the German citizenship and the frequent travel to Germany, the fact that he has family in Germany, I believe a mother and a brother.  It seems like the -- it appears that the only family that he has here is an adult son.  His minor children are not in the district --

MR. WERKSMAN:  Well, but -- by the -- may I just --

THE COURT:  Absolutely, yes.

MR. WERKSMAN:  They actually lived with him in the Malibu home I'm told until very recently, and then wife -- the ex-wife, Lisa Short, moved to Arizona, to Flagstaff, with the children.  But he's very close to them.  I mean, they're his kids, they're little.  He'd be abandoning a ten-year-old and a 13-year-old if he left.

THE COURT:  It -- you know, I'm glad you mentioned that because sometimes there can be -- especially for an

attorney just assigned to the case, but at the prior hearing, and there's no reason you obviously should know this, but there was a vigorous representation that Mr. Fritsch should be released because he is a single dad responsible for minor children. And, again, there can be lack of rescission, there can be incomplete knowledge, but my recollection was that that was a forceful argument that in other words he had --

MR. WERKSMAN: He did --

THE COURT: -- primary custody --

MR. WERKSMAN: He -- well, he did, your Honor, because what happened is the two boys were living with him. And when he was arrested, they were taken to the airport I believe by his current girlfriend, Michelle --

THE COURT: Okay.

MR. WERKSMAN: -- Mayor who's here, and they flew back to mom.

THE COURT: Okay.

MR. WERKSMAN: So he was in fact caring for the boys.

THE COURT: Okay, I appreciate that.

MR. WERKSMAN: They have joint custody, and he does pay child support. So, your Honor, in fact, yes, that was not a misrepresentation by Mr. Townsend. He does have these boys. And they'd be living with him still if he hadn't been arrested.

THE COURT: Okay.

MR. WERKSMAN: It's summer, you know, they were with

16

him, they live with him, they basically have two parents who have joint custody. But he is responsible for them financially, he pays child support every month, and so it is not a misrepresentation to say that he cares for these boys. And he has literally and physically cared for them and had custody of them.

THE COURT: Okay, but it's not -- but there is a joint custody and so it's not a situation where there's no one to take care of them --

MR. WERKSMAN: No --

THE COURT: -- it sounds like.

MR. WERKSMAN: No, they haven't been sent to an orphanage. But, I mean, they've got a mother and now they don't have a father. And their dad was living with them, was like arrested right under their nose last Wednesday and disappeared. And they were shuttled to an airport where they were flown to mom in tears. That's what happened.

THE COURT: I do appreciate that. I just -- perhaps I said it unartfully. I was -- it was the suggestion and I suppose it's open to different interpretation was that there was no other parent in the picture.

MR. WERKSMAN: No, I wouldn't have made that -- I would not make that representation.

THE COURT: Right, no, no, and I'm not saying that you did. And I appreciate the clarification because I think

17

it's an important one.  The -- again, looking at 3142(g), the --

MR. WERKSMAN:  Your Honor, can I say something about this Bahamian thing?  I know that bothered everybody.  You know, when you're not thinking you're about to get indicted, and you do have -- you're a traveling person, you're Europeans -- you know, Europeans are -- they're peripatetic.  They're a little more like peripatetic than Americans who are not quite as peripatetic.  And he had a house in the Bahamas.  He got a driver's license there.  If you get residence, official residence there, when you have a house, there are tax advantages.  There could be tax advantages anyway to being -- to the Bahamian citizenship.  If you're not under indictment, it's not really a suspicious or concerning factor in somebody's life to have a link to the Bahamas.  It only becomes a problem when you arrest somebody and say, oh, my gosh, if we let you go, you're going to run to the Bahamas or you might have something in the Bahamas that we don't know about.  So I would ask the Court not to be concerned about that so much, because if you don't know that you're under Federal investigation and you simply have a foot in the Bahamas every now and then for tax reasons or for -- to shield yourself from liability, certain corporations are established in the Bahamas, people do that all the time.

And, yeah, he traveled to Germany because he has

family there.  And by the way, he does business in Germany. There is a -- the Germans are very interested in -- it's a high tech country and so he's traveled frequently to Germany.  But, again, outside the context of being indicted, that wouldn't seem suspicious or unusual.  If he'd been summonsed in, we would have surrendered his passport and he -- and, of course, I'm assuming that any release order, if there is one, would contain a travel restriction and he'd be confined to Los Angeles County or the Central District of California, and that's fine now.  But before he knew about this case, you know, there's simply no reason why he would not have had this kind of lifestyle.  That's what people in sort of an upper echelon of the tech world do.  They travel to trade fairs, they do business around the world.  It's a global economy.  And now you -- I would hate for that to prejudice him now.

**THE COURT:**  The other thing that I want that does trouble me is -- it's somewhat I suppose you could argue remote in time, but on the other hand the fact of it is it's at least alleged occurrence, is this incident in 2003 or 2004 regarding the service of a subpoena.  And especially based on everything you've said portraying Mr. Fritsch as obviously a very accomplished and educated individual, the idea that the -- there was somehow an English language barrier that -- and maybe I'm misspeaking, but if you could address that a little bit more.

19

MR. WERKSMAN:  Your Honor, I discussed that at some length with my client.  And this is one of those bizarre occurrences that must have found its way into some FBI file that Special Agent Austin retrieved when he began investigating this case that, oh, there was some contact with this man 14 years ago where there was a door knock, and he has absolutely no recollection of how the conversation proceeded.  All he knows is that if they were looking for him for any reason, they didn't serve him with anything and they went away.  His best recollection is that they were looking for someone named Robert Short, who is the brother of Lisa Short, who was at that time his wife.  Now, look, your Honor, I'm sure we've all done things in our lives that 15 years later somebody could drudge up and say, you know, somebody remembers talking to you one day and they asked you a question and you gave this bizarre response, and you might say, I have no idea what you're talking about.  I think that's one of these -- this is one of those times.  Obviously at the time the Government didn't think it was significant.  They didn't arrest him for making a false statement to the FBI.  If they were looking for Bernard Fritsch, they certainly didn't -- and they thought that he was denying that he was Bernard Fritsch, they didn't take any steps to confirm it.  I mean, I guess the next question is to the FBI, so when this gentleman said, I'm not Bernard Fritsch or denied knowing where he was and you just left and put a little

note in the file, what happened next?  Did you -- how do you know it was him?  Did you proceed with any kind of surveillance, did you -- were you trying to serve him with something, was he a witness, did he end up in court?  I mean, what happened to that whole incident?  It's being told in a very lopsided, fragmented way.  We're just hearing that some FBI agent dropped a note in a file saying that this guy tried to fudge me when I was asking who Bernard is or something.  I mean, we don't really know anything about it.  I have no doubt that if we proceed to litigation in this case, we'll get FBI 302s on that and maybe we'll learn a little more about it and maybe the FBI will sheepishly have to acknowledge that they made a big deal over nothing.  I don't know.  But 14 years ago they claim that he denied that was him at his doorstep, and then no further action was taken, and we're to use that as some evidence that he's a pathological liar.  If that's all they've got, your Honor, please release him today, let's get all the discovery, let's figure this case out, and we'll litigate the underlying case while he's at home, subject to electronic monitoring, without his passport, deprived of the right to travel, and tethered with a cash bond.  And then we can get the affidavits to follow once they're approved.

**THE COURT:**  Thank you very much, Mr. Werksman.  I'll hear from the Government now.

**MR. WERKSMAN:**  Thank you, your Honor.

21

THE COURT:  Thank you.

(Pause)

MS. PALMER:  Good afternoon, your Honor.

THE COURT:  Good afternoon.

MS. PALMER:  The proposed bond here simply can't mitigate the risk of flight.  First of all, the bond suggested is unsecured.  The new persons who are offering unsecured bond as of today, Pretrial has not had an opportunity to determine whether they're even appropriate sureties.  And I would note that the Pretrial Services report does conclude that Short is not a suitable surety, and that's because she had been receiving payments through -- she was receiving actually monthly payments through one of the companies that this laundered money was going into.  So, your Honor, I wanted to address just a few of the things that the defense counsel raised.

As to the German passport, of course the Government is not arguing that his German citizenship in and of itself, that raises the specter of flight.  It's the fact that he has significant ties to Germany, that he travels there frequently, that he has two brothers, a mother there.  And the fact that Germany does not extradite is important evidence because to the extent that he were to flee, the Government would have no recourse.

I also note that the private jet, I just wanted to

22

correct -- at least point the Court to the record as to the private jet.  So defense counsel told the Court and also advised us before this hearing that that's a deal that fell apart in June or July.  However, if the Court looks at the exhibits that the Government has attached, there are in addition to the purchase agreement, the Government attached emails.  And those emails relating to that private jet purchase with the Defendant were sent to the Defendant and the Defendant also corresponding relating to it were in the days before his arrest.  So the idea that this is a deal that fell apart, that he was not involved in, he at least was intending to purchase this jet.  To the extent his partner then purchased it, you know, we have no evidence relating to that.  The evidence we have is what we've submitted to the Court, and it would indicate that the private jet was to be delivered in that week of his arrest.

As far as I would also like to point the Court to the Bahamas.  In addition to Germany, he is a legal permanent resident of the Bahamas.  Defense counsel argued that that shouldn't be something that's held against him, it's something that a lot of businessmen choose to do.  I would note that the exhibit that the Government has attached which was found during the search warrant of the -- the search warrant executed here, it appears that this particular document was obtained in March of 2017.  So the Defendant was, even though he had permanent

23

residence there which would enable him to both live there and work there, that he did obtain this document in March of 2017, so that's a more recent development along with, you know, gearing up to buy a private jet.  There's at least an inference that this would enable him to flee to the Bahamas.

He also appears to own a yacht.  That's through one of these shell companies.  So he would be able to flee. There's a 70-foot yacht that he appears to own or have ownership in.  And I would note that for a private yacht or a jet, it's very hard for the Government to receive notice of impending travel relating to those things, particularly a yacht.  We generally wouldn't receive any notice if someone was taking a yacht.  And I spoke with the agent who spoke with people familiar with the tax notification system, and they indicated that for a private jet, the Government would basically have very little hope of being notified in advance. TECS generally works with the commercial airlines who would indicate to the Government that this person has booked a ticket.

So the Government has grave concerns about flight for those reasons in addition to, which has not really been touched upon, the significant financial assets that are at the Defendant's disposal.  And given the very low amounts of the bonds here in contrast to the amount that the Defendant has through various properties, you know, he has -- the house he

24

lives in is worth $14 million.  The cars at his house near --
more than half a million.  And then the house in the Bahamas is
worth 4.15 million.  And as far as it being a house that he
used to own, the Government did attach in its exhibits where he
indicated that that was his residence, the yacht club exhibit
that the Government attached, that he was living in the
Bahamas.

I would also note that as far as the need for him to
get back to his company, he did indicate that he had already
signed a letter of resignation.  That isn't something that's
before the Court or submitted to the Government or to Pretrial.
At the same time, he's arguing that he needs to be involved in
the business.  So those claims appear to be kind of contrary to
one another.

I also note that this was a company that appears to
be -- you know, looking at the allegations in the complaint,
the misrepresentations are laid out in great detail between --
from paragraph 26 through 55.  These four investors are not
just a few disgruntled investors.  They're investors that of
the 35 million alleged contributed approximately 25 million.
So this is a significant portion.  Even if there were
additional investors, these were -- these constituted the vast
majorities, so going to the strength of the evidence here.  One
moment.

And, your Honor, just to discuss briefly the 2003

25

incident.  So in 2003, the Defendant was -- an FBI agent knocked on his door to serve him with a subpoena.  He gave a fake name and a fake date of birth.  The law enforcement agent then went back and looked up photographs to compare them to the Defendant and determined that he had lied about who he was, that he had given the name of a real individual but that it was not him.  After that time, there -- apparently the FBI contacted his attorney and eventually he accepted the subpoena. So it wasn't the type of situation where the Government was going to prosecute him, but the fact is that he was a very sophisticated person and that it appeared to that agent that he was trying to get out of being served with the subpoena at that time.

So, your Honor, given the nature and circumstances of the offense here, the huge amount of money involved, the very meager bond package that's being offered, most of which is unsecured, the history and characteristics of the Defendant, including the fact that he has lied in the past, the fact that his involvement here that are -- it's not just he said/he said with these investors.  There are emails included.  Those emails are detailed in the affidavit.  And then the nature and seriousness of any danger to the community.  I mean, having him say that he wants to still be involved in this company is of grave concern to the Government as well.  So based upon all of these things, the Defendant is a flight risk and by a

26

preponderance of the evidence.  Does the Court have any additional questions --

THE COURT:  No, not at this --

MS. PALMER:  -- for the Government?

THE COURT:  -- time, thank you.  I --

MS. PALMER:  Okay, on that, your Honor, we would submit.

THE COURT:  Okay.  Mr. Werksman, I would like to just follow up with a couple of things that Ms. Palmer raised.  And I apologize, I had also wanted to inquire about Ms. Short. There is some concern about her suitability as a surety.  The complaint affidavit describes how for -- and perhaps it was the money to support his children, but nevertheless it looks -- it appears to be a diversion of proceeds from StarClub to Ms. Short on a monthly basis for I think 2014 to April, 2017.

MR. WERKSMAN:  This is a great example, your Honor, of why we have trials because, you know, one man's meat is another man's poison.  The Government is saying that there was some misappropriation of corporate funds by way of payments to Ms. Short.  I think the true fact is that she did work for the company and drew a very modest salary.  He also does make child support payments to her.  But, you see, to kind of tarnish her eligibility as a surety, because during a two-year period she received a few thousand dollars a month from the company that owns the house, because she did some work for the company, and

I think we'll attempt to prove that if we have to, like other alleged misappropriations of corporate funds that are littered throughout the affidavit, we will respond in the appropriate forum.  But with regard to Ms. Short, I don't think she should be disqualified because she received some modest monthly payments, again, which I'm told were salary for work she did. But also she does receive I believe it's something in the order of $3,200 a month for child support.

I also want to address the Bahamian house, your Honor.  I'm told that was sold in 2008.  He does not own a house in the Bahamas.  He may have listed that Bahamian address for I think it was in connection with the yacht club where the boat is, but that was an old address or a mail drop.  It has nothing to do with a house.  The house was sold.

The boat is in Florida.  He would have to travel across country to get to the boat.  Anybody could get in a boat anywhere.  I don't know that the fact that he owns a boat makes him more likely to flee by boat, especially if the boat's in Florida.  Any defendant in the Central District could go down to the Redondo Beach Marina and hop on a fishing boat and go to Mexico.

So I think the Government can conceive of a hundred ways that an affluent, well-traveled 56-year-old man might flee, but that doesn't mean he will.  He's -- and the funny thing here is, your Honor, that he's been given no opportunity

to prove that he won't.  I have to prove a negative.  I have to stand here and try to convince you he's not going to flee.  But the Government never gave him a chance to stand his ground and dispute these charges and argue that he's an innocent man, and so they're taking a half a dozen instances, vignettes in the life of an affluent, well-traveled man:  the boat, Bahamian link, travel to German.  And they're putting it all together and saying, see, we had to arrest him, otherwise he would vanish.  And now my difficult job is to say, no, he wouldn't vanish, he was never given a chance to stand his ground.  If you give him a chance, your Honor, he will stand his ground.

And by the way, he's an outstanding candidate for electronic monitoring because we know where he's going to live, we know what he does, we know where we don't want him to go.  He's going to be on a no-fly list.  He's not going to go to Florida.  He's -- everybody who's released from these courts is told not to go to a point of egress from the country and nobody argues, well, they could go to Redondo Beach and get on a fishing boat and go to Mexico.  He's as likely to do that as he is to sail a yacht from Florida.  So anyway, I submit, your Honor, that we've made a -- we've overcome the Government's preponderance by establishing this man deserves a right to be placed on a reasonable bond.  And we do have a reasonable bond.

THE COURT:  Let me ask you just the last question then, Mr. Werksman, to give you an opportunity to address it,

is the argument that the bond is meager when put up against the financial resources that Mr. Fritsch has or has access to.

**MR. WERKSMAN:**  Well, your Honor, the problem is he doesn't really have access to these assets.  So, for example, the house.  The house is now tied up in this case and we expect that there will be civil litigation.  He can't dispose of the house.  I mean, he's not going to put it for sale.  No one's going to let him sell the house so what is he going to do with the house in Malibu?  He can live there on an ankle bracelet.

A boat in a harbor in Florida, he'll probably have to sell it.  We'll do that through Pretrial Services if necessary. We'll be transparent and he'll liquidate that because he's going to have bills to pay and creditors who are coming after him.

You know, he's offering what he's got.  He's got a brother who loves him who sent money to my trust.  He's got some people here who want to support him with what they have. And this Court has ample means and Pretrial has ample methods and resources to assure that he will not leave that house without the Government being notified.

**THE COURT:**  Thank you very much.

**MR. WERKSMAN:**  Thank you, your Honor.

**THE COURT:**  Thank you.  All right, I have considered the statements and arguments of Mr. Werksman and the Government.  I've reviewed the Pretrial Services report, the

supplemental report provided to the Court today.  I've also reviewed the -- Mr. Werksman's opposition to detention, your filing, as well as the Government's reply to Mr. Werksman's papers.  I've also reviewed the complaint affidavit that's been filed in this matter, Mr. Fritsch.  And having considered all of that, I am not going to reverse my previous order.  I am going to order that you continue to remain detained with respect to risk of nonappearance.  In reaching that decision, I'm mindful of the Government's burden to prove that you are a flight risk.  I find that the Government has met its burden by a preponderance of evidence, which is what it's required to do.  In talking to your attorney, Mr. Werksman, I've previewed some of the things that I'm concerned about.  I'm going to go over those things for you so that you have a better understanding of how I reached my ruling.  And then you can talk to Mr. Werksman later about what you want to do, if anything, regarding my ruling.

As I expressed throughout today, I am concerned about your international connections.  It's not the fact that you are a citizen of Germany or the fact that you're an LPR or permanent resident of the Bahamas.  What I'm concerned about is that when I balance those ties to your ties here in the Central District, I see that those ties to other areas, to other locations, outweigh your ties to this district.  And I guess in a non-lawyerly way, it means that you don't have that much to

hold you here.

I also am concerned about the significant financial resources that you either control or have access to.  I appreciate Mr. Werksman's point that many of your assets, maybe your biggest one, your house here, will be tied up.  But from the other evidence, exhibits that have been placed in front of me, you appear to have considerable financial resources available to you, I think certainly much greater than the average individual who appears in front of magistrate judges in this court.

Additionally, as I stated at our -- the first appearance, the first time that you came in front of me, I am persuaded -- or I do find the Government's argument a strong one about the fact of the extradition treaty between Germany and the United States, the fact that if you were to decide you didn't want to appear and face the charges here in the Central District, that there would be a very easy way for you to avoid that, which would be to return to Germany.  As the Government has presented it, it appears that either Germany would not extradite you because you are a German citizen, or that it would be more difficult for the Government, for the United States, to seek your extradition given that you have family there.  Again, going back to an -- my earlier point, your ties there appear to be very strong.  And it would not appear to be a great hardship for you to have to continue to -- or go back

to Germany and be there when you have family and presumably close friends there as well.

Additionally, the -- as I talked to Mr. Werksman about, this incident back in 2003, I think Mr. Werksman did a very good job of trying to I think remind me, everybody can become flustered and perhaps misspeak. But the service of a subpoena or the attempt of the service of a subpoena and the providing of a different name and, as the Government's indicated, a date of birth, I think is something that I take and weigh significantly. As your attorney described, you are a very sophisticated individual, very educated, and very accomplished. And you must as part of your tremendous business success have some familiarity with process. And, frankly, even if you didn't, I think for any ordinary individual who doesn't have the education and skills, talent that you have, you can honestly answer and provide your name when a subpoena is served.

So those are all of the factors that I'm considering. I've also considered as I indicated earlier to Mr. Werksman the factors outlined in 3142. I have looked at as I said the complaint affidavit, but I'm mindful of the Ninth Circuit's guidance that the weight of the evidence is the least important factor. Here I don't find it irrelevant but I have given it -- so I have given it some weight but not a significant amount of weight.

33

Let me just go over my notes.  That is everything that I have to say, Mr. Werksman.  If you want to place anything else on the record, please feel free to do so, sir.

MR. WERKSMAN:  I'll submit it, your Honor.  Thank you for hearing us out.

THE COURT:  Okay.  Anything else from the Government?

MS. PALMER:  No, your Honor.

THE COURT:  Okay, thank you.

MS. PALMER:  Thank you.

THE COURT:  Thank you.

THE CLERK:  Court is adjourned.

**(This proceeding was adjourned at 2:51 p.m.)**

34

## CERTIFICATION

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

_____                    October 31, 2017

         Signed                                      Dated


*TONI HUDSON, TRANSCRIBER*