TRACY L. WILKISON
United States Attorney
SCOTT M. GARRINGER
Assistant United States Attorney
Chief, Criminal Division
MONICA E. TAIT (Cal. Bar No. 157311)
Deputy Chief, Major Frauds Section
KAREN E. ESCALANTE (Cal. Bar No. 304686)
Assistant United States Attorneys
Major Frauds Section
       1100 United States Courthouse
       312 North Spring Street
       Los Angeles, California 90012
       Telephone: (213) 894-2931/3358
       Facsimile: (213) 894-6269
       E-mail:    monica.tait@usdoj.gov/
                  karen.escalante@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | No. CR 17-00520-DSF |
|---|---|
| Plaintiff, | GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTION FOR ORDER (I) REDUCING BOND AMOUNT AND (II) REMITTING FUNDS TO DEFENDANT FOR PURPOSE OF FUNDING LEGAL DEFENSE; EXHIBITS |
| v. | |
| BERNHARD EUGEN FRITSCH, | |
| Defendant. | Hearing Date: December 13, 2021 Hearing Time: 8:30 a.m. Location:    Courtroom of the Hon. Dale S. Fischer |

Plaintiff United States of America, by and through its counsel of record, the United States Attorney for the Central District of California and Assistant United States Attorneys Monica E. Tait and Karen E. Escalante, hereby files its opposition to defendant BERNHARD EUGEN FRITSCH's Motion for Order (I) Reducing Bond Amount and (II) Remitting Funds to Defendant for Purpose of Funding Legal Defense.

This opposition is based upon the attached memorandum of points and authorities, the accompanying exhibits, the files and records in this case, and such further evidence and argument as the Court may permit.

Dated: November 22, 2021         Respectfully submitted,

TRACY L. WILKISON
United States Attorney

SCOTT M. GARRINGER
Assistant United States Attorney
Chief, Criminal Division


_____/s/_____
MONICA E. TAIT
KAREN E. ESCALANTE
Assistant United States Attorneys

Attorneys for Plaintiff
UNITED STATES OF AMERICA

**TABLE OF CONTENTS**

DESCRIPTION                                                                PAGE

TABLE OF AUTHORITIES...............................................i

MEMORANDUM OF POINTS AND AUTHORITIES...............................1

I.     INTRODUCTION................................................1

II.    STATEMENT OF FACTS..........................................3

       A.    Defendant's Current Secured Bond.....................4

       B.    The Parties Have No Operative Agreement to Sell the
             Malibu Property......................................5

       C.    Defendant's Known Sources of Income..................6

III.   ARGUMENT....................................................9

       A.    The Bond Should Remain Unchanged.....................9

       B.    Defendant's Monsanto-based Arguments are Procedurally
             Deficient, and the Proposed Release of Property
             Subject to Forfeiture Should be Denied..............10

IV.    CONCLUSION.................................................15

**TABLE OF AUTHORITIES**

<u>DESCRIPTION</u>                                                                <u>PAGE</u>

**<u>CASES</u>**

<u>Caplin & Drysdale, Chartered v. United States</u>,
      491 U.S. 617 (1989)...........................................11

<u>Kaley v. United States</u>,
      571 U.S. 320 (2014)........................................12, 15

<u>Luis v. United States</u>,
      136 S. Ct. 1083 (2016).....................................12, 13

<u>United States v. Bonventre</u>,
      720 F.3d 126 (2d Cir. 2013)...................................11

<u>United States v. Farmer</u>,
      274 F.3d 800 (4th Cir. 2001)..................................11

<u>United States v. Jones</u>,
      160 F.3d 641 (10th Cir. 1998).................................11

<u>United States v. Monsanto</u>,
      491 U.S. 600 (1989).......................................passim

<u>United States v. Unimex, Inc.</u>,
      991 F.2d 546 (9th Cir. 1993)...............................11, 13

**<u>STATUTES</u>**

18 U.S.C. § 1343.....................................................1

18 U.S.C. § 1957..................................................1, 5

18 U.S.C. § 3142..................................................2, 9

18 U.S.C. § 981......................................................1

18 U.S.C. § 982......................................................1

28 U.S.C. § 2461.....................................................1

**<u>OTHER AUTHORITIES</u>**

Stefan D. Cassella, Asset Forfeiture Law in the United States
      (2d ed. 2013).................................................11

**<u>RULES</u>**

Fed. R. Crim. P. 32.2(a)............................................14

i

## MEMORANDUM OF POINTS AND AUTHORITIES

**I.    INTRODUCTION**

Defendant BERNHARD EUGEN FRITSCH ("defendant") has been charged in an indictment with wire fraud in violation of 18 U.S.C. § 1343 and money laundering in violation of 18 U.S.C. § 1957 and is alleged to have defrauded investors of millions of dollars.  (Dkt. 19, Indictment.)  In addition, the indictment alleges two forfeiture allegations pursuant to 18 U.S.C. § 981(a)(1)(c) and 28 U.S.C. § 2461(c), and 18 U.S.C. § 982(a)(1), which have put defendant on notice that the United States intends to seek forfeiture as part of any sentence in the event of defendant's conviction under any of the wire fraud or money laundering counts.  (Dkt. 19.)  The forfeiture allegations specifically provide notice to defendant that, if convicted, the United States will seek forfeiture of: (1) all right, title, and interest in any and all property, real or personal, that constitutes or is derived, directly or indirectly, from the gross proceeds traceable to the commission of the wire fraud scheme charged in Counts One and Two, including the property located in Malibu, California with Assessor Parcel Numbers ("APN") 4451-011-073 and 4451-011-074 (collectively, the "Malibu Property"); and (2) all right, title, and interest in any and all property, real or personal, involved in or traceable to the money laundering offenses, including the Malibu Property, the largest portion of which is specifically identified in Count Five.  (Id.)

Defendant is currently released on a $7,439,129.07 bond, $7,200,000 of which is secured by the largest portion of the Malibu Property (APN 4451-011-073, or "the Malibu Residence").  (Dkt. 166; Dkt. 136.)

Defendant now moves for an order (1) reducing the amount of defendant's appearance bond to $1 million, and (2) remitting the net proceeds in excess of that amount from a (now-cancelled) sale of the Malibu Property to the client trust account of attorney John L. Littrell, thereby shielding the transferred funds from criminal forfeiture.[1]  (Dkt. 172 ("Motion").)

The Motion should be denied.  First, defendant remains a flight risk, and a substantially smaller $1 million bond is far below what is reasonably necessary to assure defendant's appearance as required in this matter.  See 18 U.S.C. § 3142(c)(1)(B).  Defendant argues that because he has complied with the Court's travel orders up to now, he is no longer a flight risk.  In fact, it is likely the heavy financial consequence posed by the current substantial bond – specifically, the threat of loss of defendant's Malibu mansion in the event of noncompliance - that has ensured defendant's adherence with the Court's prior orders permitting travel.  Second, defendant's attack on the forfeiture provisions of the indictment and the two *lis pendens* recorded against the Malibu Property is procedurally deficient because defendant has completely failed to make the required threshold showing, including proving by detailed evidence that he lacks sufficient assets to pay retained counsel.[2]  For these reasons, the bond and *lis pendens* should remain unchanged.

---

[1] On November 3, 2021, the Court granted the request of John L. Littrell to appear specially relating to the filing of a motion to determine what funds can be released from the sale of the Malibu Property and how much of the funds will be allocated towards defendant's defense in the matter. (Dkt. 171.)

[2]  There is no indication whether the other sureties have agreed in writing to defendant's proposed changes to the terms of his release.  See Criminal Standing Order § A.3. (April 20, 2020) (requiring consent by sureties to changed conditions of release).
*(footnote cont'd on next page)*

**II.   STATEMENT OF FACTS**

As charged in the indictment, beginning no later than January 2014, and continuing until at least August 2017, defendant executed a scheme to defraud investors by soliciting funds from potential investors to be invested in StarClub, Inc. ("StarClub"), a company for which he was the Chief Executive Officer ("CEO").  To induce investors to invest in StarClub, defendant falsely represented to potential investors that StarClub had numerous patents issued in its name, that several entertainment companies and investment funds were on the verge of acquiring part or all of StarClub, or planning commercial partnerships with StarClub, that StarClub had generated $15 million in revenue in 2015, that StarClub had spent $90 million in technology development, and that well-known companies were current StarClub investors.  (Dkt. 19.)  As defendant knew, however, those representations were false.  Defendant also represented to investors that defendant would use investor funds for certain specified purposes.  Instead, however, defendant used approximately $7.9 million of investor funds to pay for his personal, non-business expenses, including the purchase of luxury cars and the payment of mortgage payments and property tax payments on his residence in Malibu.  (Dkt. 19; Dkt. 1, Criminal Complaint at ¶¶ 85-86, 90-91.)

Defendant is not a United States citizen, and is instead a German national.  Although Germany has an extradition treaty with the United States, Germany will not extradite German citizens.  (See Dkt. 4-3 at 8 (Article 7 of Extradition Treaty with the Federal Republic of Germany); Dkt. 16 at 15 (Article 16 of German Constitution); Dkt.

Nor is there any indication in the Motion whether the supervising United States Probation and Pretrial Services officer is aware of or takes a position on the proposed bond reduction.

16 at 8, Declaration of Marcus Busch ¶ 4.)  Defendant's mother and two brothers live in Germany, which he regularly visited prior to indictment.  (Dkt. 16 at 4 (Pretrial officer's statement); Dkt. 4-4 at 2 (travel history).)   Defendant is also a legal permanent resident of the Bahamas.  (Dkt. 16-1 at 2 (Bahamian Certificate of Permanent Residency.)  At least one account which received investor funds in this matter also transferred funds to a trust in the Bahamas (Dkt. 1 at 49, Complaint ¶¶ 88(a)-(b)(i)), suggesting that defendant also may have access to accounts there.

### A.    Defendant's Current Secured Bond

Defendant is currently released on a $7,439,129.07 bond, $7,205,000 of which is secured by the Malibu Residence.  (Dkt. 166; Dkt. 136.)[3]  Defendant is subject to numerous conditions of release, including one requiring him to keep the mortgage and property tax payments on the Malibu Residence current.  (Dkt. 166 at 4.) Defendant has previously stipulated that "[t]he entire equity in the Malibu Property is subject to forfeiture in this case . . . ."  (Dkt. 46 at 2 n.1.)  As a result, defendant also stipulated, and the Court ordered, that the Malibu Residence is subject to sale on terms to be proposed by the government in the event defendant fails to pay the mortgage or property taxes:

> Mr. Fritsch shall make all mortgage and property tax payments on the Malibu Property to keep the existing mortgage and taxes current; in order to determine compliance, Mr. Fritsch shall provide proof of such payments to PSA within five business days following the due date of each such payment; if Mr. Fritsch misses two

[3] The remainder is covered by two third-party sureties: Marc Montgomery ($134,129.07, secured by property) and David Stocker ($100,000 unsecured).  (Dkt. 166; see also Dkt. 48 at 2 (Montgomery and Stocker); Dkt. 60 (Stocker); Dkt. 56 (Montgomery).  A prior surety (Lisa Short) and her property were released by the Court in June 2021 upon the parties' stipulation.  (Dkt. 158 at 1.)

consecutive mortgage or property tax payments, Mr. Fritsch agrees (<u>without objection</u>) to the interlocutory sale of the Malibu Property on terms to be provided by the government.

(Dkt. 48 (Order Re Release And Conditions Of Bond) at 2, ¶ 2.e. (emphasis supplied); <u>see also</u> Dkt. 46 at 3, ¶ 4.e. (defendant's stipulation to the quoted terms) and Dkt. 166 at 4 (initialed by defendant).)  The Los Angeles County Assessor's website indicates that property taxes on the Malibu Residence are currently delinquent (Ex. 1 at 1), and defendant's counsel of record (Ms. Kelley) has indicated to government counsel that the mortgage is not being paid. (<u>See</u> Dkt. 176 at 5.)  Thus, the preconditions for the interlocutory sale of the Malibu Residence on terms provided by the government may presently exist.

**B.    The Parties Have No Operative Agreement to Sell the Malibu Property**

In addition to the bond obligation in favor of this Court, the entire Malibu Property is affected by two *lis pendens* in favor of the government in this case to secure the property's availability for criminal forfeiture consistent with the charges in the indictment. Specifically, Count Five of the indictment alleges that the Malibu Residence was involved in a money laundering transaction with crime proceeds in violation of 18 U.S.C. § 1957.  Moreover, the indictment's forfeiture notices allege that the Malibu Property constitutes or is traceable to the wire fraud scheme, as charged in Counts One and Two.  Considering that the Malibu Residence secures defendant's bond, and that the entire Malibu Property is subject to criminal forfeiture, defendant cannot use the equity in the Malibu Property for his own purposes, including to pay defense counsel.

5

On June 11, 2021, the Court entered an order (the "Order Permitting Sale," Dkt. 156) authorizing defendant to sell the Malibu Property for $11,550,000 to the specific buyer set forth in a March 30, 2021 offer attached as Exhibit A to the parties' related stipulation ("Sale Stipulation"), and on "the terms set forth in the [related] Stipulation."  (Dkt. 156 at 1; Dkt. 155 (Sale Stipulation) and 155-1 at 7-16 (March 30, 2021 Residential Purchase Agreement)).) The government's agreement to the Sale Stipulation (and Order Permitting Court's Sale) was contingent on several requirements, including time limits for opening and closing escrow.

As the Court is aware, the sale to which the parties stipulated never closed, the time limits were not met, and the deal with the specific buyer covered by the Stipulation and this Court's Order Permitting Sale is defunct.  (Dkt. 176 at 3-5; Dkt. 173 at 1-2.) Instead, defendant recently asked the government to agree to a November 1, 2021 offer from a new buyer, but the government refused to stipulate to the sale of the Malibu Property to that buyer in light of the common ownership between the buyer and its lender, and their apparent ties to an advance fee loan scheme.  (Dkt. 173 at 2-3.)  Consequently, as of this filing, there is no agreement between the parties, nor any operative order from the Court, providing for the private sale of the Malibu Property.

**C.    Defendant's Known Sources of Income**

Since the time of his initial release, defendant has pursued numerous business opportunities.  For example, multiple times in 2018, defendant sought and received this Court's permission to "travel . . . for the purpose of pursuing a work opportunity that ha[d] been arranged by a senior partner and defense industry practice

group leader at PwC (aka PricewaterhouseCoopers).  The work opportunity involve[d] software development for a national security project" and the opportunity "contemplated [defendant] working as an independent contractor . . . ."  (Dkt. 77 at 3, n. 1; Dkt. 80; see also Dkt. 81 at 3; Dkt. 82; Dkt. 91 at 5; Dkt. 92; Dkt. 96 at 4-6; Dkt. 100.)  In June 2018, defendant sought and received permission to lift curfew conditions so he could "meet with customers, other software developers, technology consultants, and professionals (e.g., lawyers)," and to lift digital device restrictions "to perform his work," including developing and testing digital applications.  (Dkt. 91 at 4-5; Dkt. 92.)  Based on counsel's representation that defendant continued to work on the PwC-related project and anticipated need to travel for two-to-three meetings per month, in October 2018 defendant sought and obtained a permanent modification of his conditions of release, allowing him from then on to travel to Washington D.C. upon giving notice to his supervising United States Probation and Pretrial Services officer (i.e., without needing to return to the Court for permission).  (Dkt. 101 at 4-5; Dkt. 102.)  Defendant obtained a similar permanent modification in January 2019, allowing him to travel to New York and San Francisco upon notice to his Pretrial officer "for work purposes only" "to attend meetings with certain technology companies."  (Dkt. 106 at 3; Dkt. 107.)  Defendant sought and obtained permission to travel to England, France, and Spain for more than two weeks in June 2019 to attend "a series of prospective business meetings (with government agencies as well as technology and defense companies) in Europe . . . ."  (Dkt. 112 at 3; Dkt. 117.)  Finally, defendant proposed to the government that he be allowed to take another two-week trip to Europe during the

Coronavirus pandemic in December 2020, because he "ha[d] business meetings scheduled in London and Munich" and needed "to engage in those meetings in order to pursue business opportunities and earn income to support his living expenses and legal fees."  (Ex. 2 at 1.)[4]  These activities suggest defendant has had access to substantial financial resources to fund his travel and has undoubtedly earned income from this work.

Defendant has other potential sources of income as well.  A press release dated April 2019 announced that defendant was the founder of i3 Operations, Inc., a technology company which has "proprietary algorithms" relating to scrolling social media posts for harmful behavior.  (Ex. 3 at 1 (publicly available at https://www.businesswire.com/news/home/20190409005302/en/i3-Ops-Artificial-Intelligence-Platform-Can-Help-Avert-Threats-To-Public-Safety).)  More recently, real estate documents indicated that on November 1, 2021, defendant was authenticating his signature documents from an email address at the domain monogramnetwork.com, indicating a new potential business association.  (Dkt. 176 at 23 (Exhibit B, November 1, 2021 Residential Purchase Agreement).)

Finally, defendant has earned income from renting out the Malibu Property for events.  Earlier in 2021, the government obtained (from a renter's representative) a copy of a contract showing that defendant rented out the Malibu Property for just four days in October 2020 and charged $32,000.  (Ex. 4 at 2, 8.)  Defendant signed the contract as the representative of Malibu Events Management LLC ("Malibu Events").  According to California Secretary of State

---

[4] After the government indicated it would oppose, defendant did not propose this trip to the Court.

records which are publicly available, Malibu Events was formed in June 2018; was registered to the Malibu Residence; defendant was listed as a manager or member as of July 2018; and defendant continued to sign corporate documents through August 2021.  (Ex. 5 at 1, 2, 3 (California Secretary of State online records).)  In light of the above, it is likely that defendant has earned an unknown amount of rental income from the Malibu Property between 2018 and the present.

**III.  ARGUMENT**

### A.    The Bond Should Remain Unchanged

Defendant is a flight risk, as correctly reflected by the current bond amount and release conditions.  In light of defendant's German citizenship; his permanent residence status in the Bahamas where he likely has access to funds; his close family ties to Germany, a country that does not extradite its nationals; and the seriousness of the charges and potential sentence he faces in this case, the current bond and release conditions represent "the least restrictive further condition, or combination of conditions, that . . . will reasonably assure the appearance of the [defendant] as required" in this case.  18 U.S.C. § 3142(c)(1)(B).

Defendant argues that because he has complied with the Court's prior orders permitting him to travel on multiple trips, this proves he is no longer a flight risk and that his bond should be reduced to $1 million.[5]  (Motion at 8.)  Indeed, defendant suggests that it

---

[5] While the government assumes that defendant has complied with the Court's travel orders, the government does not concede that defendant has complied with all conditions of release, particularly in light of the delinquent property tax status of the Malibu Residence.

9

would be punitive to require a bond amount above $1 million.  (See id. at 10.)  In fact, none of the facts that make defendant a flight risk have changed since the first release conditions were set. Defendant's compliance with orders he was always required to follow instead demonstrates how effective the current bond conditions have been to secure his appearance.  At all times during his travels, defendant knew that if he had violated the Court's orders, he risked losing an extremely valuable asset, the Malibu Property.  That's why he complied.  If the Court were to reduce the bond as requested to $1 million, defendant's incentives to follow the Court's orders would be reduced as well.  Thus, the appropriate bond amount is one that could result in the complete loss of the Malibu Residence if defendant were to abscond and should therefore remain unchanged.

**B.    Defendant's Monsanto-based Arguments are Procedurally Deficient, and the Proposed Release of Property Subject to Forfeiture Should be Denied**

Defendant further argues that the government's criminal forfeiture notice and two *lis pendens* should be disregarded as having no effect, and that the Court permit defendant to use any funds greater than $1 million (defendant's proposed bond amount) remaining from a potential liquidation of the Malibu Property for the purpose of hiring a particular criminal defense firm.[6]

In United States v. Monsanto, 491 U.S. 600, 614 (1989)  the Supreme Court held that pre-trial asset restraints based on probable

---

[6]  As already noted, there is no private sale pending to which the parties have stipulated, and the parties' prior stipulation is inoperative.  Accordingly, the Court should disregard defendant's request (Motion at 11, n. 5) to cause withdrawals of the *lis pendens* to be delivered anywhere.

10

cause are constitutionally permissible, even when a defendant seeks to use those restrained assets to pay for counsel.  And in Caplin & Drysdale, Chartered v. United States, 491 U.S. 617, 626 (1989), the Court held that "[w]hatever the full extent of the Sixth Amendment's protection of one's right to retain counsel of his choosing, that protection does not go beyond the individual's right to spend his own money." (quotation omitted).

Post-Monsanto, a criminal defendant may seek a limited hearing to challenge the probable cause for an asset restraint (a "Monsanto hearing") — but the defendant is entitled to such a hearing only if he first shows he has a bona fide need to use restrained assets to pay for his counsel of choice.  Thus, the defendant must make an initial showing of a potential Sixth Amendment injury.  In United States v. Unimex, Inc., 991 F.2d 546, 551 (9th Cir. 1993), for example, the Ninth Circuit held that the burden is squarely on the movant to establish a "substantial claim" of a Sixth Amendment injury through "sufficiently definite, specific, detailed, and nonconjectural" affidavits.  The Second Circuit has similarly held that to qualify for a Monsanto hearing, a defendant must disclose his net worth, provide a comprehensive list of his assets, and explain how he has been paying his counsel and other living expenses.  United States v. Bonventre, 720 F.3d 126, 133 (2d Cir. 2013); accord, United States v. Jones, 160 F.3d 641, 647 (10th Cir. 1998) ("[a]s a preliminary matter, a defendant must demonstrate . . . she has no assets, other than those restrained, with which to retain private counsel"); United States v. Farmer, 274 F.3d 800, 804-05 (4th Cir. 2001); see also Stefan D. Cassella, Asset Forfeiture Law in the United States (2d ed. 2013), § 17-6 ("Under Jones and Farmer, a

11

defendant has a right to a post-restraint, pre-trial hearing if he makes two threshold showings: 1) that he has no assets other than those subject to the restraining order with which to exercise his Sixth Amendment right to counsel or to pay for living expenses; and 2) that there is a bona fide reason to believe that the court (or the grand jury) erred in finding probable cause to believe that the restrained property would be subject to forfeiture if the defendant is convicted.").

Moreover, courts have imposed strict guardrails to prevent defendants from using Monsanto as a general pre-trial discovery device or a fishing expedition into the government's case.  In Kaley v. United States, 571 U.S. 320, 324 (2014), the Supreme Court held that a Monsanto hearing is not a forum to relitigate a grand jury's probable cause finding—but is limited to challenging the alleged nexus between the seized property and the charged offense.

In Luis v. United States, the Supreme Court addressed a related issue: "Whether the pretrial restraint of a criminal defendant's legitimate, untainted assets (those not traceable to a criminal offense) needed to retain counsel of choice violates the Fifth and Sixth Amendments."  136 S. Ct. 1083, 1088 (2016).  The defendant there allegedly dissipated suspected fraud proceeds pre-indictment, and the government obtained an order restraining her admittedly untainted property.  See id.  The defendant argued that this restraint violated her Sixth Amendment rights, and the Supreme Court agreed, holding that the defendant had "a Sixth Amendment right to use her own 'innocent' property to pay a reasonable fee for the assistance of counsel."  Id. at 1096.  Luis hinged on the fact that

12

the property was indisputably untainted and "belong[ed] to the defendant, pure and simple." Id. at 1090.

In sum, Monsanto and Luis each provides a defendant with the opportunity to use untainted funds to pay for their defense if needed.  But, as shown below, regardless of whether Monsanto or Luis applies, defendant must first establish — through sworn declarations or affidavits — that he cannot pay for his counsel of choice without access to the seized asset.  Defendant's Motion must be denied because he has failed to make this necessary threshold showing.  To the contrary, defendant relies exclusively on conclusory and self-serving assertions about his finances, unsupported by any evidence.  Motion at 1:17-20.[7]  Defendant should not be permitted to make the required showing belatedly in his Reply.

Despite the specific allegations contained in the indictment, as well as his prior concession that "[t]he entire equity in the Malibu Property is subject to forfeiture in this case . . . ," (Dkt. 46 at 2 n.1), defendant now simply asserts that the Malibu Property is untainted, and accordingly, this case is governed by Luis rather than Monsanto.  But irrespective of how defendant originally acquired title to the property in 2008, defendant cannot sidestep the Grand Jury's probable cause findings, and the Monsanto and Unimex cases, simply by ignoring these findings and decisions.  The Motion

---

[7]  Defendant's Motion can be read to suggest that the government stipulated to defendant's professed financial condition (Motion at 6:15-17).  If so intended, that suggestion is misleading.  The cited paragraphs from a prior stipulation expressly set forth only defendant's representations as to his financial condition, and not a stipulation from the government agreeing to the truth of those statements.  (Dkt. 135 at ¶¶ 11-12 ("Mr. Fritsch represents" that he lacks funds); compare ¶ 14 ("The parties recognize and agree" to the value of a parcel (emphasis added)).)

13

implicitly admits that the Malibu Property was restrained based on a finding of probable cause by the Grand Jury.  The Grand Jury returned an indictment charging defendant with wire fraud and money laundering.  The indictment included the Government's forfeiture allegations which stated that if the defendant is convicted of the wire fraud counts, it would seek forfeiture of the Malibu Property as proceeds of the wire fraud (as alleged in Counts One and Two) and as property involved in the money laundering (as alleged in Count Five). Forfeiture allegations in an indictment are meant to put a defendant on notice of a possible punishment if the defendant is convicted. Fed. R. Crim. P. 32.2(a).  The allegations are not a civil complaint for forfeiture which must set forth evidence establishing probable cause for forfeiture.  This is because property is not forfeited in a criminal case based on the forfeiture allegations of an indictment – it is forfeited based on evidence presented at trial and/or in a post-trial forfeiture proceeding.  Simply put, defendant points to no requirement that the Government must establish probable cause for forfeiture in the forfeiture allegations of an indictment, because no such requirement exists.

The Court should not turn a blind eye to what defendant is attempting.  If granted, defendant's Motion would practically nullify the rule of Monsanto: no rational defendant would ever follow the procedures set by courts post-Monsanto when they could ignore a Grand Jury's finding of probable cause, and instead just assert that seized assets are untainted and obtain a hearing to try to release assets— all without proving that they even intend to use such assets to fund their defense.  Nothing in the Motion justifies such a radical change in the law.

14

The Motion, which is unsupported by any declarations from defendant explaining how much money he needs to pay counsel or prepare for trial, what the trial budget might be, what expenses he intends to pay from any released funds, what would become of any unspent or excess funds not ultimately paid to counsel, or even swearing that he will actually use any funds released to pay counsel, must be denied as being procedurally deficient.  See Kaley, 571 U.S. 320, 355 (2014) (Roberts, J., dissenting) ("[W]e are not talking about all of a defendant's assets that are subject to forfeiture—only those that the defendant can show are necessary to secure his counsel of choice.").

**IV.    CONCLUSION**

For the foregoing reasons, the government respectfully requests that this Court deny defendant's motion (Dkt. 172) for an order reducing bond and remitting funds.

15