E. MARTIN ESTRADA
United States Attorney
MACK E. JENKINS
Assistant United States Attorney
Chief, Criminal Division
MONICA E. TAIT (Cal. Bar No. 157311)
SARAH S. LEE (Cal. Bar No. 311480)
JOSEPH DE LEON (Cal. Bar No. 313471)
Assistant United States Attorneys
Major Frauds Section
    1100 United States Courthouse
    312 North Spring Street
    Los Angeles, California 90012
    Telephone: (213) 894-2931/7407/7280
    Facsimile: (213) 894-6269
    E-mail:    monica.tait@usdoj.gov
               sarah.lee@usdoj.gov
               joseph.de.leon@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>       Plaintiff,<br><br>         v.<br><br>BERNHARD EUGEN FRITSCH,<br><br>       Defendant. | No. CR 17-00520-DSF<br><br>GOVERNMENT'S MOTION *IN LIMINE* #3 TO ADMIT DEFENDANT FRITSCH'S (1) PRE-ARREST STATEMENTS TO INVESTIGATORS, AND (2) STATEMENTS MADE IN UNDERCOVER RECORDINGS; EXHIBITS<br><br>Hearing Date: December 30, 2024<br>Hearing Time: 8:30 AM<br>Location:    Courtroom of the<br>             Hon. Dale S.<br>             Fischer |

Plaintiff United States of America, by and through its counsel of record, the United States Attorney for the Central District of California and Assistant United States Attorneys Monica E. Tait, Sarah S. Lee, and Joseph De Leon, hereby files its motion in limine #3 to admit statements defendant Bernhard Eugen Fritsch made in the following contexts: (1) statements defendant made to law enforcement

agents prior to defendant's arrest, and (2) statements recorded at a May 24, 2017 meeting by an undercover agent, and by a victim of the fraud scheme at the direction of law enforcement.

This motion is based upon the attached memorandum of points and authorities, the files and records in this case, and such further evidence and argument as the Court may permit.

Pursuant to the Court's standing order, the government has met and conferred with defense counsel regarding this motion.

Dated: December 2, 2024          Respectfully submitted,

E. MARTIN ESTRADA
United States Attorney

MACK E. JENKINS
Assistant United States Attorney
Chief, Criminal Division


          /s/
MONICA E. TAIT
Assistant United States Attorney

Attorneys for Plaintiff
UNITED STATES OF AMERICA

**TABLE OF CONTENTS**

DESCRIPTION                                                                    PAGE

**Contents**

TABLE OF AUTHORITIES..............................................................ii

MEMORANDUM OF POINTS AND AUTHORITIES...............................................1

I.    INTRODUCTION.................................................................1

II.   FACTS.......................................................................2

      A.    Recorded Undercover Meeting at StarClub on May 24, 2017...............3

            1.    Defendant's Claims About US Mastertec........................3

            2.    Defendant's Claims About his Compensation....................4

            3.    Defendant's Claims About Use of Investment Proceeds..........5

            4.    Defendant's Statement About StarClub Finances...............6

            5.    Defendant's Offer to Repay Investor D.G. Using Funds from New Investors.....................................6

      B.    Recorded Voluntary Interview of Defendant by FBI Agents..............7

III.  ARGUMENT...................................................................10

      A.    Defendant's Interview with FBI Special Agents was Noncustodial and Voluntary, and the Portions Offered by the Government are Admissible........................10

      B.    Even If Defendant was "in Custody" During the Interview, he was Advised of his *Miranda* rights and Impliedly Waived Them..................................13

      C.    When Offered by the Government, Defendant's Recorded Interview and Undercover Statements are not Hearsay......16

      D.    The Court Should Preclude Defendant from Offering Other Portions of His Interview and the May 2017 Undercover Recordings as Inadmissible Hearsay...........17

IV.   CONCLUSION.................................................................18

i

**TABLE OF AUTHORITIES**

DESCRIPTION                                                                PAGE

**CASES**

Berghuis v. Thompkins,
         560 U.S. 370 (2010)...........................................14

Colorado v. Connelly,
         479 U.S. 157 (1986)...........................................14

Davis v. United States,
         512 U.S. 452 (1994)...........................................14

Miranda v. Arizona,
         384 U.S. 436 (1966)...........................................13

Moran v. Burbine,
         475 U.S. 412 (1986)...........................................14

North Carolina v. Butler,
         441 U.S. 369 (1979)...........................................16

United States v. Bassignani,
         575 F.3d 879 (9th Cir. 2009)..................................11

United States v. Burreson,
         643 F.2d 1344 (9th Cir. 1981).................................17

United States v. Crawford,
         372 F.3d 1048 (9th Cir.2004)..................................10

United States v. Eide,
         875 F.2d 1429 (9th Cir. 1989).................................13

United States v. Fernandez,
         839 F.2d 639 (9th Cir. 1988)..................................17

United States v. Kim,
         292 F.3d 969 (9th Cir.2002)...................................11

United States v. Larson,
         495 F.3d 1094 (9th Cir.2007)..................................17

United States v. Ortega,
         203 F.3d 675 (9th Cir. 2000)..................................17

United States v. Thierman,
         678 F.2d 1331 (9th Cir.1982)..................................16

United States v. Vallejos,
         742 F.3d 902 (9th Cir. 2014)..................................17

**TABLE OF AUTHORITIES (CONTINUED)**

DESCRIPTION                                                                        PAGE

United States v. Whitman,
        771 F.2d 1348 (9th Cir. 1985)...............................16

United States v. Williams,
        930 F.3d 44 (2d Cir. 2019)..................................18

**STATUTES**

18 U.S.C. § 1343...................................................1

18 U.S.C. § 1957...................................................1

**RULES**

Fed. R. Evid. 106.................................................18

<u>**MEMORANDUM OF POINTS AND AUTHORITIES**</u>

**I.   INTRODUCTION**

Defendant Bernhard Eugen Fritsch ("defendant") is set for trial on January 14, 2025 on the government's indictment, which charges him with two counts of wire fraud and three counts of money laundering, in violation of 18 U.S.C. §§ 1343, 1957.  The Indictment alleges that defendant made false and fraudulent statements to induce investors to invest millions of dollars to purchase interests in StarClub, Inc., a company controlled by defendant.  (CR 19 (Indictment).)[1]

The government intends to offer in its case-in-chief several instances of defendant's recorded statements.  First, the government will seek to introduce portions of defendant's voluntary interview with FBI Special Agents on the day the FBI executed a search warrant at StarClub's business premises.  Even though this interview was pre-arrest and noncustodial, defendant was Mirandized prior to the interview, and as argued below, his voluntary statements to agents are admissible in the government's case-in-chief.[2]  Second, the government will seek to introduce portions of audio recorded on May 24, 2017 by an undercover agent of the Federal Bureau of Investigation ("UCE") and investor/victim D.G. at the StarClub premises in Santa Monica, California.  The portions to be offered include certain statements the defendant made at the meeting with the

---

[1] "CR" refers to the docket number of the referenced document, and is sometimes followed by a page citation to the Court's ECF-applied pagination of the document, or to a paragraph number citation.

[2] The government notes that it possesses and has disclosed in discovery other recorded statements by defendant that the government does not intend to offer in its case in chief:  (1) statements recorded by an investigator for D.G. in December 2016 in New York; (2) statements recorded by the same investigator about a week later in California.

UCE, as well as statements defendant separately made to D.G. alone out of the UCE's presence.  Finally, the government also moves to preclude defendant from introducing other portions of defendant's recorded interview and undercover statements as hearsay, not subject to any exception.[3]

## II.   FACTS

Defendant ran StarClub, Inc., a company that claimed to develop computer software applications that would assist social media influencers, including celebrities, in monetizing their brand endorsements.  (CR 1 at 5, 7 (Complaint).)  Between January 2014 and December 2016, StarClub raised approximately $35 million from a number of investors, including D.G., who controlled a fund which pooled the assets of multiple participants including D.G. himself.  The indictment alleges that defendant solicited investors to invest money in StarClub, falsely claiming that StarClub had numerous patents issued in its name; that well-known companies were on the verge of acquiring part or all of StarClub, or were planning commercial partnerships with the company; that other well-known companies such as "Access Industries," "Credit Suisse," and "Warner" were current StarClub investors; and that StarClub had generated $15 million in revenue in 2015, and had spent $90 million on technology development.  (CR 19 at 3-5.)  In fact, the Indictment alleges, these claims were false and fraudulent.  Moreover, defendant caused more than $7.9 million to be transferred to non-StarClub accounts controlled by defendant (including accounts of US Mastertec LLC, Greenwich Music Inc., 3229 Rambla Pacifico Inc., and others) to pay

---

[3]  All transcriptions attached as Exhibits are in draft form, subject to finalization prior to trial.

2

for personal, non-business expenses.  (Id. at 4-5; see also CR 1 (Complaint and supporting affidavit) at 44 (chart of Greenwich Music and 3229 Rambla Pacifico transfers), 48-53 (US Mastertec transfers).)

**A.    Recorded Undercover Meeting at StarClub on May 24, 2017**

By May 2017, victim D.G. suspected he had been defrauded in connection with the more than $20 million he had invested in StarClub via the fund he controlled, and had already spoken to the FBI about his experience.  D.G. is expected to testify that at the direction of the FBI, D.G. introduced the UCE to defendant and StarClub as a potential new investor.  On May 24, 2017, while the investigation was covert, the UCE and D.G. attended a meeting at StarClub, both of them wearing recording equipment supplied by the FBI.  See Exh. A (describing UCE participation in the recording) and B (describing D.G. participation in the recorded meeting).  At the May 24, 2017 meeting, defendant pitched the UCE to invest in the company.  The recorded audio from these meetings have been disclosed to the defense in discovery.

At trial the government presently intends to introduce the following portions of defendant's statements made during the meeting[4]:

**1.    Defendant's Claims About US Mastertec**

During the portion of the meeting where he was demonstrating the company software, defendant suggested that US Mastertec was an arms-length supplier to technology services to StarClub:

> *BF:  These are all software modules that we had to develop or had to purchase. And it's all owned by our*

---

[4]  The government reserves the ability to offer additional excerpts, depending on the circumstances at trial, including in response to any evidence and argument offered by defendant.

*company. It's all– it's all 100 percent owned, the entire IP.*

*UC:  I mean all by STARCLUB or do you guys have an umbrella of other companies or is everything under one-one roof here?*

*BF[5]: No, we have other companies that we are working with –*

*UC:  Ok.*

*BF:  Uh, such as – uh STARCLUB, STARSITE, US MASTERTEC, and uh several others really –*

*UC:  Ok.*

*BF:  But all of these other companies are really service companies, because sometimes we cannot have the service here, couldn't find the right people here and what not, you know what I mean? Or we uh couldn't get the right price to do it here.*

*UC:  But we own all the IP?*

*BF:  We own all the IP, a hundred percent. That really what's counting you know I mean?*

Exh. C at 1.[6]

Contrary to defendant's suggestion that US Mastertec was a disinterested third party, the government's proof at trial will show that defendant controlled US Mastertec and directed its expenses.

2.    Defendant's Claims About his Compensation

Defendant was accompanied by two other StarClub executives at the recorded meeting.  When asked what his salary was, defendant claimed that the executives at the table, himself included, earned only $10,000 per month each:

*UC:  So Bernhard you have skin in the game or you uh-*

*BF:  Me?*

---

[5]  BF in these draft transcriptions refers to defendant Fritsch.

[6]  The exhibits to this Motion include additional transcribed material beyond that the government seeks to introduce.

4

> UC:   Yeah.
>
> BF:   We have more than enough. Ten, ten million.
>
> UC:   Okay. And you're taking salary too? I-I assume?
>
> BF:   So-so what we're doing, we run this thing here. Ten thousand a month. Ten thousand a month, ten thousand a month, ten thousand a month. That- that's how it works. And it's sellable also to… break people, that used to take a million –
>
> UC:   Yeah.
>
> BF:   A year. Uh it's not that we're – that they- these guys are excited about that, but, it's… you know it shows that we're really confident [UI 01:46:42]. Tough conversation.

Exh. D at 6.  The evidence at trial will show that, contrary to the claim that he made $10,000 a month, defendant instead sucked millions of investor dollars out of StarClub from approximately 2014 to 2016 for payment of his personal and non-StarClub expenses.

        3.    <u>Defendant's Claims About Use of Investment Proceeds</u>

Defendant indicated that the purpose of the $25 million fundraising pitch to the UCE was to "ramp up" staffing.  Exh. D at 4-5 (highlighted) ("So it's basically a big technology component and a-uh, human resource component infrastructure. This is- that's all we need.")

In fact, as discussed below, defendant was planning to pay D.G. a large commission or percentage if the UCE invested money.  In addition, this statement will corroborate D.G.'s expected testimony that defendant told investors money was raised for StarClub's core business purposes, which the government's financial analysis of company bank accounts is expected to refute.

4.    Defendant's Statement About StarClub Finances

Defendant claimed at the meeting that the company had $2 million in the bank:

> UC: What- what do we have for cash in there right now in the bank?
>
> BF: We have two million in the bank and we burn [i.e., spend] six-hundred and twenty thousand.

Exh. E at 1.  Based on the results of the government's draft financial analysis, the truth was that by late May 2017, StarClub was almost out of money, and indeed had less than $500,000 across all of its known accounts.   Accordingly, this is another instance of defendant lying to solicit new investment money.

5.    Defendant's Offer to Repay Investor D.G. Using Funds from New Investors

D.G. was also wearing recording equipment during and after the same May 24, 2017 meeting with the UCE, and this equipment captured separate conversations with defendant (at which the UCE was not present) in defendant's office and at a restaurant.  D.G. is expected to testify and authenticate recording clips showing that while in defendant's office, defendant offered to pay D.G. 20-25% of the amount successfully raised from the potential investor at the meeting (i.e., the UCE), and from other potential investors:

> BF:  What else do you want me to do for you?
>
> DG:  I, look, I think um…
>
> BF:  So this deal […] this deal to happen, do you want me to buy shares from you? [UI]
>
> DG:  Yeah, I think look at some point I'd like to get…
>
> DG:  Whatever, whatever you're comfortable with right, so um, you know if um, um, so I can get some of my capital back right, cause I got a lot into this thing, um, you know, that takes a little pressure off me and, so I'll

*leave that to you, figured whatever is easiest for you, so, you know…*

*[**]*

*BF:  So let me make sure you get a chunk of that money back.*

*DG:  Thank you.*

*[**]*

*BF:  So, um, if he's good for 25 million, so let me see, let me get you maybe 20 percent of that back, 25 percent, 5, 6, 7 million…*

*DG:  Yup, that works.*

*BF:  How does that sound?*

*DG:  That works, so, yeah 10, 20, yeah 25 percent would be, but is that, we just want to make sure that is enough to get you through.*

*BF:  Well, yeah exactly so do the math, 25 percent of 25 [UI].*

*DG:  Six, whatever it is six mil, so…yup, and then if we have to back end additional money, I think I can get other guys to come in, Bernhard, so, um…*

*BF:  Well we can play this game all night long. You take 20, 30 percent of what comes in, you know what I mean.*

Exh. F at 1-2; Exh. B at 1 (Interview of D.G. regarding May 24, 2017 meeting).  D.G. is expected to further testify that later, after sharing a meal, defendant reaffirmed his promise made in his office to use later investor money to repay D.G.  Exh. G at 2 (per defendant: "And everything we discussed in my office we will execute as discussed.").

**B.    Recorded Voluntary Interview of Defendant by FBI Agents**

On August 2, 2017, the FBI executed search warrants at the StarClub business premises.  Special Agent ("SA") Greg Austin is expected to testify that he conducted a recorded interview with defendant, with two StarClub attorneys in attendance, and executed

7

the arrest warrant for defendant after that interview.  The government seeks to introduce certain of defendant's pre-arrest statements.  Exhibit K is a draft transcription of the interview recording up to the approximate point at which defendant stopped answering questions on the advice of StarClub attorneys.

Before speaking to SA Austin, defendant told another FBI SA that he agreed to be interviewed by the case investigator, and asked if two StarClub attorneys could attend, to which the FBI consented. Exh. H at 1.  What followed was a voluntary interview in which defendant was first read his Miranda rights, initialed but refused to sign an Advice of Rights form (Exh. J), answered many of the agent's questions, and declined to answer others.  Defendant took two breaks during the interview process, including to confer with at least one of the attending StarClub attorneys.  See Exh. I at 1.[7]

The government expects to offer some or all of the portions of the recording highlighted in yellow on Exhibit K.  These portions cover the following topics, in the order in which they appear in the draft transcription:

-Defendant was an employee of Greenwich Music Inc. ("GMI") along with StarClub CFO James Polsen, and about $1 million per year flowed to GMI for those salaries, accountants, lawyers, and non-StarClub travel (Exh. K at pp. 7-8);

-StarClub did not earn much revenue, and was only starting to generate revenue (id. at 18).

---

[7]  At one point, defendant spoke to SA Austin alone, outside the presence of StarClub's counsel.  This exchange occurred after the portion covered in Exhibit K.  The government does not intend to offer statements from that portion of the interview in its case-in-chief.

-StarClub spent around $60-70,000 per month on salaries, and spent most of its money on technology (id. at 25-26);

-US Mastertec is a "technology service provider . . . that we have been using[;]" defendant did not know whether it was an arms-length supplier; and defendant did not know what else US Mastertec did beyond development of technology (id. at 29);

-3229 Rambla Pacifico Inc. owned the house in which defendant lived; StarClub was invoiced for events StarClub did there; StarClub paid around $25,000 per month to the company; and StarClub had no employees currently worked at the 3229 Rambla Pacifico residence (id. at 31-32);

-K.K. (which the trial evidence will show is defendant's former girlfriend) does work for StarClub; and none of defendant's other family members worked for StarClub, US Mastertec, or GMI, with the exception that defendant's ex-wife L.S. may have worked for US Mastertec (id. at 37-38);

-StarClub had an investor in the Bahamas named Trident. (id. at 39); this admission is relevant to the government's financial analysis at trial to show the source of incoming funds;

-Defendant was not the owner of a yacht in the Bahamas, and did not know where that yacht was currently located (id. at 40-41)[8];

---

[8] The trial evidence, including financial analysis, will show that defendant concealed payments using investor funds to the corporate owner of a yacht, the Madame Musique, over which defendant exercised ownership and control.

-StarClub had American Express credit cards issued to persons including George Mederos, and Mederos made purchases for StarClub (id. at 43-44)[9];

-Access Industries, Credit Suisse, and Warner were not StarClub investors; this is contrary to claims defendant had made to investors (id. at 43-44);

-Defendant had never offered to pay anyone a percentage of a potential investor's investment (id. at 50-51); and

-Defendant recalled he had purchased a McLaren (a luxury car) "a while ago" but could not say how he had come to purchase a Rolls Royce (id. at 55)[10].

**III.  ARGUMENT**

> **A.    Defendant's Interview with FBI Special Agents was Noncustodial and Voluntary, and the Portions Offered by the Government are Admissible**

"A confession is involuntary if coerced either by physical intimidation or psychological pressure."  United States v. Crawford, 372 F.3d 1048, 1060 (9th Cir. 2004) (en banc) (internal quotation marks omitted).  In determining whether a defendant's statement was voluntary, this Court considers whether, under the totality of the circumstances, "the defendant's will was overborne at the time he confessed."  Id. (internal quotation marks omitted).

If the defendant makes statements while under custodial interrogation, Miranda warnings must be provided and defendant must

---

[9] Mederos is expected to testify that he was a personal assistant and estate manager for defendant, and did not work for StarClub.

[10] The trial evidence, including dealership and bank records and testimony from Mederos, will show that defendant caused both cars to be purchased in a straw corporate name.

waive those rights before such statements may be used in the government's case-in-chief.  "To determine whether an individual was in custody, a court must, after examining all of the circumstances surrounding the interrogation, decide whether there [was] a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest."  United States v. Bassignani, 575 F.3d 879, 883 (9th Cir. 2009), citing United States v. Kim, 292 F.3d 969 (9th Cir. 2002) (cleaned up).  Courts consider five non-exhaustive factors when evaluating whether an interrogation was custodial or not:

> (1) the language used to summon the individual; (2) the extent to which the defendant is confronted with evidence of guilt; (3) the physical surroundings of the interrogation; (4) the duration of the detention; and (5) the degree of pressure applied to detain the individual.

Kim at 974 (internal quotation omitted).

Defendant here was "summoned" in a non-confrontational way to speak with agents, in that he was advised during the execution of the search warrant that the case agent for the investigation wished to ask defendant questions about StarClub.  Exh. H.  Defendant agreed to participate in an interview, and asked whether two attorneys present at the office could attend (indicating that they represented StarClub), and agents agreed.  Id.; Exh. I at 1-2.  The "physical surroundings" of the interview were defendant's own company premises, during the execution of a search warrant by federal agents.  Exh. H.  While this meant that many law enforcement agents were undoubtedly in the office suite, there is no indication that they acted in an aggressive or confrontational manner, at least through the time defendant was invited to attend the interview.  The draft interview transcription itself shows that the StarClub attorneys (Dan Johnson ("DJ") and Charles Sanders ("CS")) actively participated throughout

11

the interview.  These accommodations would give a reasonable person a feeling of control over the circumstances of the interrogation, and are indicative of a lower "degree of pressure" surrounding the interview.

Further lowering the pressure were the agent's advisements that the interview was voluntary:

> It's a search warrant's interview.  Obviously, it's voluntary, your attorney's here. Um, you know so, uh you can answer what you want, right?  And we'll try to uh make known to you kind of why we are here uh and hopefully kind of clear it up.

Exh. K at 3.  After reading defendant his Miranda rights, the agent advised defendant that he could refuse to answer questions or stop talking at any time.  See id. at 6 ("If you're comfortable answering great, if not, you know we . . . you're well within your right to stop.").  The StarClub attorneys similarly reminded defendant of his right to stop answering questions.  See, e.g., id. at 13, 14. Defendant was not told that he was restrained or arrested.  In response to one StarClub attorney's question whether "everybody [is] going to be free to go," the agent responded that "we're going to as[k] Mr. Fritsch to-to stay here, uh and continue to answer the questions," but that "nobody is under arrest this time."  Id. at 15.  During the course of the interview, defendant took breaks, including to confer privately with the StarClub attorneys.  Id. at 14, 41-43.  Defendant declined to answer specific questions, and was not pressured when he did so.  Id. at 20 (answering, "Let's go to the next question," when asked whether he had participated in an investor presentation), 13 (responding "I don't want to answer" when asked whether he oversaw others at StarClub).

12

Throughout the portion of the interview transcribed in Exhibit K, the agents maintained professional and calm tones of voice as they asked defendant questions about StarClub, its business, and his role there.  Only after the portions the government seeks to introduce did the agents become more confrontational by pointing out specific conflicting statements defendant had made.  See id. at 51 ("Okay, Bernhard you know exactly what I'm talking about right now.  You and I both know the conversation that we're talking about right now. . . . I'm going to give you an opportunity okay and I'm going to remind you that lying to the FBI is a felony.")  Accordingly, based on the totality of the circumstances, during the timeframe of the portions the government seeks to introduce, the approximately 98-minute interview (including breaks)  was not a custodial interrogation, and defendant participated voluntarily.  See e.g., United States v. Eide, 875 F.2d 1429, 1432, 1437 (9th Cir. 1989) (finding that defendant was not in custody during his meeting with FBI agents at defendant's home "which lasted approximately 90 minutes" and was amicable).

**B.    Even If Defendant was "in Custody" During the Interview, he was Advised of his *Miranda* rights and Impliedly Waived Them**

Even if the Court were to conclude that defendant was in custody during all or part of the interview portions the government seeks to offer, defendant's statements to the investigating agents are admissible at trial if defendant provided a knowing and voluntary waiver of his Miranda rights.  See Miranda v. Arizona, 384 U.S. 436, 475 (1966).  Where a defendant challenges the voluntariness of a Miranda waiver, "the [government] need prove waiver only by a

13

preponderance of the evidence." Colorado v. Connelly, 479 U.S. 157, 168 (1986).  To prove a valid waiver, the government must show that (1) the wavier represented an "uncoerced choice," and (2) defendant understood both the nature of the right being waived and the consequences of waiver.  Moran v. Burbine, 475 U.S. 412, 421 (1986).

Police are not required to ask a defendant explicitly if he "waives" his Miranda rights; implicit waiver is sufficient.  The formalistic and rigid Miranda rules apply to the advisement of rights, not to the waiver of those rights.  See Berghuis v. Thompkins, 560 U.S. 370, 384-85 (2010).  Accordingly, once a suspect has been advised of his right to remain silent, police are not required to obtain an explicit waiver of this right and may commence questioning.  Id. at 387.  This is so because "the primary protection afforded suspects subject[ed] to custodial interrogation is the Miranda warnings themselves."  Davis v. United States, 512 U.S. 452, 460 (1994).

Here, defendant was fully advised of his Miranda rights, both orally (Exh. K at 4-6) and in writing (Exh. J).  On the written form, defendant applied his initials next to each enumerated advisement, except "[a]nything you say can be used against you in court."  Exh. J.  As to that advisement, defendant stated, "I'm not signing that one" (Exh. K at 5), which supports the conclusion that defendant understood he was giving up something important and was aware that continued participation in the interview could have consequences as described in the warnings.  Based on the audio and transcript, defendant heard and understood his rights, and there is no indication that he did not understand any of the advisements on the form.

14

While defendant refused to sign the Advice of Rights form indicating he was willing to answer questions, and the agents did not expressly solicit an oral waiver of rights from defendant, the circumstances show that defendant nevertheless impliedly waived his Miranda rights as to the statements the government is offering. "As a general proposition, the law can presume that an individual who, with a full understanding of his or her rights, acts in a manner inconsistent with their exercise has made a deliberate choice to relinquish the protection those rights afford." Berghuis, 560 U.S. 385. After initialing portions of the Advice of Rights form, showing that he had reviewed the form, defendant proceeded to answer agents' questions about StarClub for about the next 90 minutes, during which he also took two breaks and conferred with StarClub's lawyers. Id. at 14, 41-43. Those lawyers reminded him during the interview that he could refuse to answer or seek separate advice (id. at 11, 13-14, 31) but defendant continued to engage with and answer most of the agent's questions. Defendant never invoked the right to counsel, nor did he say he wished to end the questioning or would not respond to further questions until about 98 minutes had passed. Exh. K at 56 (a StarClub lawyer said, "I think you should stop answering questions," and defendant responded, "Yeah."). The fact that, after receiving oral and written Miranda advisements, defendant continued speaking with agents at length up until this point, carefully picking and choosing which questions he would and would not answer, supports the conclusion that he exercised his free will to answer the agents' questions, while knowing that he did not have to do so. See North Carolina v. Butler, 441 U.S. 369, 373-374,

15

376 (1979) (explaining an "implicit waiver" of the "right to remain silent" is sufficient to admit a suspect's statement into evidence; a Miranda waiver may be implied through "the defendant's silence, coupled with an understanding of his rights and a course of conduct indicating waiver"); see also United States v. Thierman, 678 F.2d 1331, 1335 (9th Cir. 1982) ("A person in custody may selectively waive his right to remain silent by indicting he will respond to some questions, but not to others."). Accordingly, the interview statements are admissible.

### C. When Offered by the Government, Defendant's Recorded Interview and Undercover Statements are not Hearsay

If introduced by the government, defendant's recorded statements, both during the undercover meetings and during his interview with agents, are not hearsay, but rather statements of a party-opponent that are admissible under Federal Rule of Evidence 801(d)(2)(A). Further, the statements of third parties on these recordings – SA Austin in the interview, and the UCE and D.G. on the undercover recordings - are not hearsay because they are admitted for context, to help the jury understand defendant's statements, and not for the truth of the matters asserted. See United States v. Whitman, 771 F.2d 1348, 1352 (9th Cir. 1985) (upholding admission of recorded conversations between government informant and the defendant's co-conspirator, as the "statements were not admitted for their truth but to enable the jury to understand the [co-conspirator's] taped statements"). Accordingly, the government may properly introduce the indicated portions of defendant's recorded interview, and the undercover recordings, in its case-in-chief at trial.

16

### D. The Court Should Preclude Defendant from Offering Other Portions of His Interview and the May 2017 Undercover Recordings as Inadmissible Hearsay

While the United States may introduce defendant's statements against him as admissions of a party opponent under Rule 801(d)(2)(A), defendant cannot himself offer his self-serving statements (unless he takes the stand in his own defense and subjects himself to cross-examination). Evidence Rule 801(d)(2)(A) permits a party opponent's statements only to be offered against that party opponent and does not open the door for defendant to put in his out-of-court statements offered on his own behalf. See United States v. Burreson, 643 F.2d 1344, 1349 (9th Cir. 1981); United States v. Fernandez, 839 F.2d 639, 640 (9th Cir. 1988) (per curiam).

Nor are defendant's additional statements in the recordings admissible under the Rule of Completeness. Under Federal Rule of Evidence 106, "[i]f a party introduces all or part of a statement, an adverse party may require the introduction, at that time, of any other part — or any other statement — that in fairness ought to be considered at the same time. The adverse party may do so over a hearsay objection." But Rule 106 does not "require the introduction of any unedited writing or statement merely because an adverse party has introduced an edited version." United States v. Vallejos, 742 F.3d 902, 905 (9th Cir. 2014)(emphasis in original). If it did, a defendant could place his statements "before the jury without subjecting [himself] to cross-examination, precisely what the hearsay rule forbids." United States v. Ortega, 203 F.3d 675, 682 (9th Cir. 2000) holding modified on other grounds by United States v. Larson, 495 F.3d 1094 (9th Cir. 2007) (citation omitted). Critically, "if

17

the complete statement does not serve to correct a misleading impression in the edited statement that is created by taking something out of context, the Rule of Completeness will not be applied to admit the full statement." Vallejos, 742 F.3d at 905 (cleaned up).  The Advisory Committee Notes to the 2023 amendment to Rule 106 make this standard clear:

> The amendment does not give a green light of admissibility to all excised portions of statements. It does not change the basic rule, which applies only to the narrow circumstances in which a party has created a misimpression about the statement, and the adverse party proffers a statement that in fact corrects the misimpression. The mere fact that a statement is probative and contradicts a statement offered by the opponent is not enough to justify completion under Rule 106. So, for example, the mere fact that a defendant denies guilt before later admitting it does not, without more, mandate the admission of his previous denial.

Fed. R. Evid. 106, 2023 Advisory Committee Notes (citing United States v. Williams, 930 F.3d 44 (2d Cir. 2019)).

Here, the government has provided sufficient surrounding context in the accompanying transcriptions for the Court to conclude that the identified statements are not misleading, and no additional statements are required to correct any misimpression that could be caused by introducing only the government's proffered statements. Accordingly, the identified statements may be admitted, and the defendant should not be permitted to introduce other statements.

**IV.  CONCLUSION**

For the foregoing reasons, the government respectfully requests

//

that this Court admit the identified statements when offered by the government at trial.


Dated: December 2, 2024          Respectfully submitted,

                                 E. MARTIN ESTRADA
                                 United States Attorney

                                 MACK E. JENKINS
                                 Assistant United States Attorney
                                 Chief, Criminal Division


                                         /s/
                                 MONICA E. TAIT
                                 Assistant United States Attorney

                                 Attorneys for Plaintiff
                                 UNITED STATES OF AMERICA

19

The undersigned, counsel of record for the United States, certifies that this brief contains 4,634 words, which: _x_ complies with the word limit of L.R. 11-6.1.

Dated: December 2, 2024                    Respectfully submitted,

                                           E. MARTIN ESTRADA
                                           United States Attorney

                                           MACK E. JENKINS
                                           Assistant United States Attorney
                                           Chief, Criminal Division


                                                    /s/
                                           _____
                                           MONICA E. TAIT
                                           Assistant United States Attorney

                                           Attorneys for Plaintiff
                                           UNITED STATES OF AMERICA