JOSEPH MCNALLY
Attorney for the United States, Acting Under
Authority Conferred by 28 U.S.C. § 515
LINDSEY GREER DOTSON
Assistant United States Attorney
Chief, Criminal Division
MONICA E. TAIT (Cal. Bar No. 157311)
SARAH S. LEE (Cal. Bar No. 311480)
JOSEPH DE LEON (Cal. Bar No. 313471)
Assistant United States Attorneys
Major Frauds Section
        1100 United States Courthouse
        312 North Spring Street
        Los Angeles, California 90012
        Telephone: (213) 894-2931/7407/7280
        Facsimile: (213) 894-6269
        E-mail:    monica.tait@usdoj.gov
                   sarah.lee@usdoj.gov
                   joseph.de.leon@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, Plaintiff, v. BERNHARD EUGEN FRITSCH, Defendant. | No. CR 17-00520-DSF <br><br> GOVERNMENT'S REPLY IN SUPPORT OF ITS MOTION *IN LIMINE* #3 TO ADMIT DEFENDANT FRITSCH'S (1) PRE-ARREST STATEMENTS TO INVESTIGATORS, AND (2) STATEMENTS MADE IN UNDERCOVER RECORDINGS; EXHIBITS <br><br> Hearing Date: December 30, 2024 <br> Hearing Time: 8:30 AM <br> Location:    Courtroom of the Hon. Dale S. Fischer |

Plaintiff United States of America, by and through its counsel of record, the Acting United States Attorney for the Central District of California and Assistant United States Attorneys Monica E. Tait, Sarah S. Lee, and Joseph De Leon, hereby files its reply in support of its motion in limine #3 to admit defendant Bernhard Fritsch's pre-

arrest statements to investigators, and statements made in undercover recordings.

This reply is based upon the attached memorandum of points and authorities, the files and records in this case, and such further evidence and argument as the Court may permit.

Dated: December 14, 2024

Respectfully submitted,

JOSEPH MCNALLY
Attorney for the United States,
Acting Under Authority Conferred by
28 U.S.C. § 515

LINDSEY GREER DOTSON
Assistant United States Attorney
Chief, Criminal Division


          /s/
MONICA E. TAIT
Assistant United States Attorney

Attorneys for Plaintiff
UNITED STATES OF AMERICA

2

**TABLE OF CONTENTS**

DESCRIPTION                                                          PAGE


TABLE OF AUTHORITIES.................................................ii

MEMORANDUM OF POINTS AND AUTHORITIES.................................1

I.    INTRODUCTION..................................................1

II.   ARGUMENT.....................................................1

      A.    Defendant was Not in Custody When he Made the
            Proffered Statements to Investigators....................1

      B.    Defendant Knowingly and Intelligently Waived his
            Miranda Rights...........................................6

      C.    The FBI Undercover Meeting Statements are Admissible......8

            1.    The Portions Sought To Be Introduced Are Audible.....8

            2.    The Undercover Meeting Statements are Relevant
                  Evidence of the Charged Wire Fraud Scheme............9

III.  CONCLUSION...................................................12

**TABLE OF AUTHORITIES**

DESCRIPTION                                                          PAGE

Cases

Berghuis v. Thompkins,
  560 U.S. 370 (2010) .............................................. 6

United States v. Craighead,
  539 F.3d 1073 (9th Cir. 2008) ................................... 5

United States v. Gomez,
  725 F.3d. 1121 (9th Cir. 2013) .................................. 2

United States v. Kim,
  292 F.3d 969 (9th Cir. 2002) ................................. 1, 4

United States v. Lane,
  514 F.2d 22 (9th Cir. 1975) ..................................... 8

United States v. Ramirez,
  No. 1:19-CR-02058-SMJ-4, 2020 WL 9457064
  (E.D. Wash. Dec. 29, 2020)....................................... 7

United States v. Tisor,
  96 F.3d 370 (9th Cir. 1996) ..................................... 8

Statutes

18 U.S.C. § 1343................................................... 9

18 U.S.C. § 1957.................................................. 10

28 U.S.C. § 515................................................. 1, 2

Rules

FRE 403........................................................ 9, 11

<u>**MEMORANDUM OF POINTS AND AUTHORITIES**</u>

**I.    INTRODUCTION**

The Court should admit the government's proffered selections from the first approximately 98 minutes of defendant Bernhard Eugen Fritsch's ("defendant") interview with agents of the Federal Bureau of Investigation ("FBI"), and five clearly audible clips of defendant speaking on recordings made during an FBI undercover investigation. For the reasons described below, defendant's objections to admissibility fail.

**II.    ARGUMENT**

**A.    Defendant was Not in Custody When he Made the Proffered Statements to Investigators**

On August 2, 2017, FBI special agents interviewed defendant at his place of business, the co-located companies StarClub and US Mastertec, in Santa Monica, California, during the execution of a federal search warrant. Defendant argues that he was in custody, and required the protections of <u>Miranda</u>. The court should find defendant was not in custody.

Defendant's argument that he was in custody is based on a series of incomplete, misleading, or wrong factual assertions:

First, defense submits that 18 FBI armed agents were present for the execution of a search warrant at the time of the interview, and they questioned all the StarClub employees, creating a "police-dominating atmosphere" favoring a finding of custody. Opp'n, CR 335:7, quoting <u>United States v. Kim</u>, 292 F.3d 969, 977-78 (9th Cir. 2002). In fact, this search warrant execution was the rare instance in which the law enforcement agents were actually outnumbered, - - by the 19 StarClub and US Mastertec employees and associates, including

defendant, present during the lunchtime search warrant execution. See Opp'n, Exhibit 1 (Report of search warrant execution, CR[1] 335:18-19). Moreover, the transcript of defendant's interview indicates no weapons were drawn, and the employees were able to "stick around" and return to work if management wished. Motion, Exh. K (CR 319-11:35) (hereafter, "Proffered transcript"[2]) (Agent: "In this case right, obviously there were no weapons we came in and we calmly informed everyone, and I know it's a little startling, but . . . ."; Mr. Sanders: "We're not complaining about that.") The number of agents present was thus not extraordinary in light of the large number of employees present at the business, and the scope of the area to be searched, and should therefore not be a dominant factor in the Court's "in custody" analysis.

Second, the defense alleges "SA Greg Austin and SA Eric Potocek separated Mr. Fritsch from the StarClub employees, prohibiting him from further contact with anyone," and separately, "[t]he only persons defendant had contact with was two StarClub attorneys." Opp'n (CR 335) at 7. The first assertion is obviously wrong, as it is contradicted by the second assertion. Instead, SA Potocek contacted defendant during the execution of the search warrant, and indicated that the case agent for the investigation wanted to ask

---

[1] "CR" refers to the docket number of the referenced document, and is sometimes followed by a page citation to the Court's ECF-applied pagination of the document, or to a paragraph number citation.

[2] Defendant has filed the draft transcript of a later portion of defendant's interview. Opp'n Exhibit 3 (CR 335-3). The government does not intend to offer in its case in chief any of the statements from that portion of the interview (but may use defendant's statements from any portion of his interview as impeachment evidence should he testify, see United States v. Gomez, 725 F.3d. 1121, 1126-27 (9th Cir. 2013)).

2

defendant about StarClub.  Motion, Exh. H (CR 319-8:2).  Defendant then agreed to be interviewed, and asked if Charles Sanders and Dan Johnson, two StarClub attorneys who were in the office, could accompany him, and the FBI agreed.  Id.; Proffered transcript, CR 319-11:3-4 (introductions).  The interview took place in a windowed, partially glass-walled conference room with a view of a balcony, palm trees, and patio furniture on one side, and other StarClub space on the other side.  Exh. L (attached) at 1-2 (agent's description and photo).  Defendant was seated with a view of both the outside balcony and the StarClub hallway, next to his two chosen attorney-companions.  Id.  The special agents left the room at the request of attorney Sanders early in the interview, and were then allowed back in.  Proffered transcript, CR 319-11:15.  Defendant also left the room during the proffered portion of the interview.  Id. at 319-11:42-44.  Thus, defendant has pointed to no evidence indicating, whether in the portion of the interview proffered by the government or otherwise, that he was prohibited from further contact with others present on the scene.

Defendant was strongly supported by his close advisors during the interview.  Both of defendant's self-selected attorney-companions were supportive of defendant throughout the interview, advising defendant not to answer particular questions and to be careful in his answers, and actively participating by asking questions of the agents.  Proffered transcript, CR 319-11 at 8 (Sanders: "If you are hesitating, I would say no then."); 11 (Sanders, suggesting defendant not disclose who supervises finances without further consultation); 14-15 (Johnson, advising that defendant should stop answering questions until he gets a specialized criminal defense lawyer; agent

confirms the conversation has to end if defendant declines answering questions, but defendant continues after taking a break to speak with Sanders and Johnson); 24 (Sanders, directing defendant not to answer, and asking questions about the FBI's investigation).  Sanders in particular was a long-time member of defendant's business team, since 2009.  See Declaration and pages from Exhibits 5 and 8 to Government's Reply to Opposition for Order Permitting Depositions, CR 263-1, 263-2:3, 15 (describing Sanders as StarClub's General Counsel since 2009 and head of business affairs since inception).  The Proffered transcript shows that defendant voluntarily continued to talk to agents for about 98 minutes in spite of the concerns his attorney-companions voiced aloud about doing so, and after consulting with them privately outside the hearing of the agents, sharply distinguishing the facts here from other business search warrant interrogations in which courts concluded the defendant was in custody, in part because they were separated from others who could support them.  See Kim, 292 F.3d at 971, 977-78 (defendant found to be in custody during interview at her store, where she arrived with her husband but police excluded him by locking the door behind defendant as she entered the store; she sat with no companions in a room surrounded by standing officers; and her son (also in the store) was told not to speak to her).

Next, defense argues the interview was three hours long and accusatory.  Not so.  The Proffered transcript covers about 98 minutes, including breaks, and the agents were businesslike, respectful, and asked many neutral-sounding questions about StarClub's operations (finances, names of investors, commercial

4

partners) along with questions about defendant's role, how he benefitted, and his prior statements to others.

Finally, the defense argues that "most importantly," defendant was not told he was free to leave, and defendant was in fact not free to leave, because after the interview, he was arrested. Opp'n (CR 335) at 7-8. According to case authority, this is not the most important consideration. "The Miranda test for custody does not ask whether the suspect was told that he was free to leave; the test asks whether a reasonable person would have felt he or she was not at liberty to terminate the interrogation and leave." United States v. Craighead, 539 F.3d 1073, 1088 (9th Cir. 2008) (cleaned up). Here, for the reasons argued above and in the Motion, not only would a reasonable CEO in defendant's position believe he was free to stop the interview and leave, but defendant himself thought so too. After defendant said he would stop answering questions (CR 319-11:57), defendant asked SA Austin, "Can, I have just a conversation with you?" (Id. at 127).[3]  Sanders consented, and the other participants (SA Potocek, Sanders, and Johnson) left defendant and SA Austin alone in the room. (Motion, Exh. I (CR 319-9 at 2). After a few minutes, this exchange occurred:

> BF: What are the next steps?
>
> GA: The next steps are . . . you get arrested.
>
> BF: Today?
>
> GA: Yeah. If you want to walk with me, uh . . . kind of towards the elevator, outside the view of the employees, I'll grab Eric, it can be just the three of us.

---

[3] The government cites these portions only for purposes of this Motion, and has no intention of introducing them at trial.

5

Opp'n, Exh. 3 (CR 335-3:6-7).  Because defendant was repeatedly advised that he could stop answering questions, and because even defendant appeared surprised to learn after the main interview that he being arrested "today" and was therefore not free to leave, it is no stretch for this Court to find that a reasonable person in the same situation would have believed so as well.  Hence, defendant was not in custody during the proffered portion of the interview.

**B.    Defendant Knowingly and Intelligently Waived his Miranda Rights**

Even if the Court were to find that defendant was in custody when he made the proffered statements, it should find that the defendant knowingly and intelligently waived his rights.  The burden to establish waiver is on the government, by a preponderance of evidence.  Berghuis v. Thompkins, 560 U.S. 370, 384 (2010).

First, defendant argues that because he refused to initial one line of the Miranda waiver form, refused to sign the form, and amended the section of the form under the word "Consent," defendant expressly invoked his Miranda rights.  The facts do not support this argument.  In the "Your Rights" section of the Miranda form, defendant initialed five of the rights of which he was also orally advised ("Can I initialize, um?," Proffered transcript, CR 319-11:6), including "[y]ou have the right to talk to a lawyer for advice before we ask you any questions."  Motion, Exh. J (CR 319-10 at 2).  As to the warning that anything he said could be used against him in court, defendant stated, "I'm not signing that one," and refused to initial that line on the form.  (CR 319-11:6.)  When it came to signing the Consent section of the form (which reads, "I have read this statement of my rights and I understand what my rights are.  At this time, I am

willing to answer questions without a lawyer present"), SA Austin observed that in fact, "[o]bviously, there are uh two lawyers present," and said "sign, don't sign[,] whatever you're comfortable with."  SA Potocek then suggested, "[y]ou can cross it out and write ["]with["] a lawyer present," referring to the Consent section of the form quoted above, which is what defendant did.  Proffered transcript, CR 319-11:7; Motion, Exh. J (form, CR 319-10 at 2), and Exh. I (report, CR 319-9 at 2).  Based on all of the above, defendant's amendment of the form at the agent's suggestion and his refusal to sign the "Consent" section was not an unambiguous invocation of his rights, including his right to counsel.

Second, the defense argues that defendant's waiver of the right to counsel could not be knowing and intelligent, because his attorney-companions had a conflict of interest, and defendants have a Sixth Amendment right to conflict-free representation.  Opp'n, CR 335:9-15.  This argument is founded on an unpublished out-of-district case upon which no other court has apparently relied.  United States v. Ramirez, No. 1:19-CR-02058-SMJ-4, 2020 WL 9457064, at *6 (E.D. Wash. Dec. 29, 2020).[4]  As Ramirez itself acknowledged, "neither the Supreme Court nor Ninth Circuit has directly addressed whether the right to counsel during a preindictment custodial interrogation encompasses the fundamental guarantee of effective assistance of counsel (including derivative rights like the right to conflict-free counsel) . . . ."  Id. at *5.  This Court should not create that guarantee here.  Police officers and FBI Special Agents are generally not lawyers, and after they read a suspect his rights from their

---

[4]  As of this writing, there are no Westlaw citing references to this decision.

Miranda cards and the suspect expressly or implicitly waives those rights, the validity of the waiver should not depend on the officers' correctly second-guessing whether an attorney accompanying the defendant in an interview has a conflict.

For the reasons argued above and in the government's Motion, the government has carried the burden to show waiver.

**C.    The FBI Undercover Meeting Statements are Admissible**

1.    The Portions Sought To Be Introduced Are Audible

The government identified five specific clips it may seek to introduce from an undercover operation conducted by the FBI in May 2017, and filed draft transcripts highlighting in yellow the precise words in the conversations the government may offer.  The defense has the audio, but has pointed out to the Court precisely zero portions of the identified clips which are unclear, inaudible, or mis-transcribed.  Instead, defendant argues that because completely different portions of the recordings made that day are difficult to hear, the clear portions proffered by the government are inadmissible.

This argument fails.  Defendant's cited case authority concerns instances in which inaudible portions of recordings were played to the jury, which is not the plan here.  See United States v. Lane, 514 F.2d 22, 27 (9th Cir. 1975)("entire recording" of conversation played for jury, including inaudible and unintelligible portions); United States v. Tisor, 96 F.3d 370, 377 (9th Cir. 1996)(inaudible portions admitted into evidence).  Defendant cites no authority to support the

8

exclusion of audible portions of a recording based on the fact that other portions are inaudible, and the government is aware of none.[5]

2.    The Undercover Meeting Statements are Relevant

Evidence of the Charged Wire Fraud Scheme

Defendant argues that evidence of defendant's statements in May 2017 is irrelevant to the charges because the charged interstate wires executing the fraud scheme occurred before May 2017, and because the undercover meeting was part of a different and uncharged fraud scheme.  Defendant further argues the undercover recordings should also be excluded based on FRE 403.  These arguments also fail.

First, the scheme to defraud is not limited to the time leading up to the charged January 2015 and January 2016 wires.

The indictment charges that defendant's wire fraud scheme in violation of 18 U.S.C. § 1343 began "no later than in or about January 2014, and continu[ed] until at least on or about August 2, 2017," the date the FBI's search warrant was executed.  Indictment, CR 1 at 3:1-4 (emphasis added).  During that time frame, the indictment charges that defendant "solicited funds from individuals in the Central District of California, in Canada, and elsewhere, to be invested with StarClub," and made false specific false representations about StarClub's patents, outside investors, outside commercial partners, 2015 revenue, and spending on technology "[t]o induce individuals to invest . . . via e-mail, telephone, and in-person conversations[.]"  Id. at 3-4.  In addition, the indictment

---

[5] The recordings begin prior to, and continue after, the time the UCE and D.G. attended an investor presentation at StarClub, and include hours of irrelevant events such transportation time, ordering coffee, and a restaurant meal.  The investor presentation was given principally by defendant.

further charges that "[w]hen soliciting funds from potential investors, defendant FRITSCH also represented that StarClub would use investor money for certain specified purposes, including . . . for working capital and general corporate purposes," which claim (among others in that paragraph) was also false because instead, defendant "caused approximately $7.9 million to be transferred to non-StarClub accounts controlled by defendant FRITSCH, or his co-schemers, to pay for personal, non-business expenses or other undisclosed purposes, including the purchase of luxury cars." Id. at 4-5. Finally, "for the purpose of executing the above-described scheme to defraud, defendant FRITSCH and his co-schemers" caused two interstate and foreign wires, the first involving victim D.G. on or about January 30, 2015, and the second involving victim I.M. on or about January 25, 2016. Id. at 5. In addition, the indictment charges that defendant engaged in monetary transactions in more than $10,000 of criminally derived proceeds of the same wire fraud scheme in January 2015, November 2015, and August 2016, in violation of 18 U.S.C. § 1957. Id. at 6.

To convict the defendant, the government must prove a scheme to defraud as the first element of wire fraud, and not just particular wire transfers to execute the scheme on particular dates. Ninth Circuit Model Criminal Jury Instructions, No. 15.35 (2022 ed.) (revised June 2024). Here, the charged wire fraud scheme expressly spans from at least January 2014 to August 2, 2017; accordingly, the government's proof at trial of defendant's "scheme or plan to defraud for the purpose of obtaining money or property by means of false or fraudulent pretenses, representations, or promises" will definitely include defendant's conduct occurring after the last charged wire

execution.  The government expects the trial evidence to show that defendant continued to deceive and attempt to deceive victim D.G. in particular well after the wire charged in Count One, for the purpose of persuading D.G. both to invest more money (which he did), and to allow defendant to promote the investment to D.G.'s contacts (which defendant repeatedly did, including with victim I.M.).  And such proof will further include evidence that through the date of the search – the day defendant was expecting to receive $25 million in investment of funds from the undercover agent D.G. had introduced to defendant -  defendant was continuing his scheme to defraud potential investors to get more money.  See Complaint, CR 1:39-41 (description of context of undercover meeting).  Thus, the May 2017 recordings do not concern a separate scheme, and are admissible to prove wire fraud.

Second, nor are the May 2017 undercover recordings excludable under FRE 403.  The government's Motion has set forth the basic extent of what will be offered concerning defendant's fraudulent offer to pay D.G. millions of dollars of a potential investor's money, and it is simple:  defendant falsely claimed to the potential investor the investment money would be used for "ramp[ing] up" staffing, and minute later, back in his office alone with D.G., secretly offered to pay some of the potential investor's funds to D.G. instead.  See Motion, CR 319:10, 11-12 (describing the facts).  Accordingly, defendant simply lied.  There will thus be no mini-trial on defendant's excuse that he was offering D.G. a "finder's fee" (Opp'n at 335:14), since in no way could a finder's fee constitute "ramp[ing] up" staffing, and defendant has noticed no expert testimony on finder's fees.

11

**III.  CONCLUSION**

For the foregoing reasons, the proffered evidence should be admitted.

# EXHIBIT L

| | |
|---|---|
| **From:** | Austin, Gregory L. (LA) (FBI) <glaustin@fbi.gov> |
| **Sent:** | Wednesday, August 16, 2017 7:46 AM |
| **To:** | Escalante, Karen (USACAC) |
| **Subject:** | Interview room |
| **Attachments:** | Interview room.jpg |

I found a photo of the Fritsch interview room taken after the interview was completed.  It appeared to be a small conference room.  The chairs are positioned in the picture roughly where they were during the interview.  Fritsch sat in the chair on the right (next to the monitor).  I sat in the chair in front of the balcony door.  Eric sat in the barely-visible chair in the back left corner.  Johnson sat in the chair in the front left corner (though he was a bit closer to the table during the interview), and Sanders sat in the chair between Johnson and Fritsch.

1

